1999-NMCA-145

992 P.2d 282

**Marta LEWIS, as Personal Representative of the Estate of Martin C. Lewis, deceased, Plaintiff–Appellant,**

**v.**

**Norberto R. SAMSON, Jr., M.D. and Raymond F. Ortiz, M.D., Defendants–Appellees.**

**No. 19,281.**

Court of Appeals of New Mexico.

Sept. 14, 1999.

Certiorari Granted, No. 25,990, Nov. 19, 1999.

JoAnne Holland, The Holland Law Office, Albuquerque, Clark Varnell, Eaves, Bardacke & Baugh, P.A., Albuquerque, for Appellant.

William P. Slattery, David B. Lawrenz, Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., Santa Fe, for Appellee Norberto R. Samson, Jr., M.D.

Lorri Krehbiel, Madison, Harbour, Mroz & Brennan, P.A., Albuquerque, for Appellee Raymond F. Ortiz, M.D.

## OPINION

APODACA, Judge.

{1} Marta C. Lewis (Plaintiff) appeals from a judgment after a jury verdict in favor of Dr. Norberto R. Samson and Dr. Raymond F. Ortiz (Defendants). As personal representative of the estate of Martin C. Lewis (the patient), Plaintiff's son, Plaintiff filed a medical malpractice suit against Defendants alleging wrongful death of the patient. The patient died while in the care of Defendants for treatment of multiple stab wounds suffered at the hands of Moses Griego, a nonparty (the assailant). Plaintiff raises four issues on appeal, claiming that the trial court (1) abused its discretion by excluding the testimony of several witnesses, (2) improperly injected the issues of the comparative fault and negligence per se of the assailant in a case essentially limited to successive tortfeasor liability, (3) should have conducted an evidentiary hearing on Plaintiff's motion for a change of venue, and (4) improperly excluded a letter from a certain physician that summarized the patient's treatment.

{2} We hold that the trial court abused its discretion in declining to reopen discovery to allow amendment of Plaintiff's witness list to add an additional witness several months before trial. We therefore reverse and remand for a new trial. Because we are remanding for a new trial on Plaintiff's first issue, we address the successive tortfeasor liability issue and the venue issue since they may reoccur at a second trial. Because of our disposition, we need not address Plaintiff's remaining issue on exclusion of the physician's letter and other witnesses.

{3} Regarding the nature of the tort liability under the facts of this appeal, we hold that the trial court erred in not determining as a matter of law before trial that Defendants were successive, and not concurrent, tortfeasors. In that regard, we also hold that the court erred in failing to ensure that trial counsel limited their argument and the evidence to that theory of liability. Finally, on the venue issue, we conclude that the trial court was not required to conduct an evidentiary hearing and did not err in denying Plaintiff's motion for a change of venue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Facts

{4} In February 1994, at approximately two o'clock in the morning, the patient was taken to the emergency room at Dan C. Trigg Memorial Hospital (Memorial Hospital) in Tucumcari, New Mexico, suffering from eight stab wounds primarily to the chest. He incurred the wounds in a fight with the assailant, who was later convicted of second-degree murder under NMSA 1978, § 30-2-1 (1994), as a result of the stabbing incident. Defendant Ortiz, an internist at Memorial Hospital, first treated the patient. Dr. Ortiz then called in Defendant Samson, a local general surgeon. Initially, Defendants treated the patient with transfusions of blood, sutured the wounds, and then inserted chest tubes. During this treatment, Dr. Ortiz telephoned University of New Mexico Hospital (UNM Hospital) to request an emergency transfer for a thoracotomy or for other assistance as deemed necessary by that hospital.

{5} The substance of Dr. Ortiz' first request was strongly disputed at trial. The doctor claimed that he first requested assistance from UNM Hospital for the patient during a 3:06 a.m. phone call. Plaintiff, however, claimed the doctor first requested assistance from UNM Hospital during a 3:57 a.m. phone call. Dr. Hanosh, a specialist in thoracic surgery at UNM Hospital, responded telephonically on behalf of that hospital at approximately 4:20 a.m., according to his private phone records. He informed Dr. Ortiz that the patient would not survive the trip to UNM Hospital; Dr. Ortiz replied that Dr. Samson was unwilling to perform the thoracotomy.

{6} Dr. Hanosh arrived at Memorial Hospital at approximately 6:11 a.m. and immediately performed a thoracotomy. By Dr. Hanosh's arrival, the patient had suffered a cardiac arrest. He was pronounced dead at 6:17 a.m. Additional facts will be discussed as relevant to our discussion of the issues.

### B. Relevant Trial Court Proceedings

#### 1. Pretrial Proceedings

{7} Initially, Plaintiff filed this case in the District Court of Bernalillo County in October 1995, naming UNM Hospital as an additional defendant. By stipulation of the parties, Plaintiff refiled the case in the District Court of Quay County after Plaintiff moved to dismiss UNM Hospital as a defendant. At a pretrial conference in February 1997, the court set July 14, 1997, as the trial date. The court did not set a discovery deadline at that time.

{8} Also in February 1997, Plaintiff responded to Defendants' request for a list of witnesses by designating "any and all personnel from [Memorial Hospital]," subject to a final witness list. By letter dated March 14, 1997, counsel for Dr. Ortiz requested Plaintiff to supplement her witness list. Plaintiff did not immediately respond. Instead, in May 1997, Plaintiff served a witness list on each Defendant. On June 11, 1997, about a month before the trial date, Plaintiff informed Defendants of her intention to add Penny Griner, an employee of UNM Hospital, to the witness list. Plaintiff intended for Ms. Griner to testify regarding UNM Hospital's procedures for responding to telephone calls. Plaintiff stated at that time that Ms. Griner would be unavailable until the week of June 16. On June 13, Defendants moved to exclude Ms. Griner as a witness on grounds of late disclosure. As of that date, the court had not set any discovery deadlines nor entered a pretrial order. At no time did Defendants depose Ms. Griner.

{9} The court held a pretrial conference on June 17, 1997. At the hearing, counsel argued the relevance of the assailant's conviction and his comparative fault to the issues in this case. The trial court postponed its decision on Defendants' motion to exclude Ms. Griner until June 30, 1997. The court entered a pretrial order the next day, June 18, 1997, which identified the parties' respective witness lists, and set a deadline of June 27, 1997, for all depositions and all other discovery.

{10} At a hearing on June 30, 1997, the court granted Defendants' motion to exclude Ms. Griner as a witness. Plaintiff's counsel unsuccessfully argued that her failure to des-

ignate Ms. Griner was an "oversight" based on her previous belief that Defendants would depose Drs. Hanosh and Burton of UNM Hospital, who could discredit Defendants' version of the facts as well as Ms. Griner could. Indeed, at the February 17 pretrial conference, Dr. Ortiz indicated an intent to depose these two doctors.

{11} On July 14, the parties were ready to begin the trial, but they were unable to impanel twelve impartial jurors due to Defendants' close ties in the community. The trial court rescheduled trial for January 1998. On July 24, 1997, after trial was rescheduled, Plaintiff filed three motions.

{12} In her first motion, Plaintiff sought to preclude Defendants from arguing the comparative fault of the assailant at trial on the ground that Defendants were successive tortfeasors, not concurrent tortfeasors. In September 1997, the trial court denied the motion, stating that the motion presented evidentiary issues best resolved by proper jury instruction.

{13} Plaintiff's second motion sought to reopen discovery and to designate additional witnesses. As noted in her brief in support of her motion, these witnesses included Ms. Griner, Sharon Faison, R.N., and "a witness from Amarillo to prove Amarillo accepts patients from New Mexico." Plaintiff identified Ms. Faison as one who would testify on the availability of "rib spreaders" at Memorial Hospital. In a response dated August 11, 1997, Dr. Ortiz opposed this motion on the grounds that Plaintiff failed to demonstrate "manifest injustice" and that Plaintiff had ample prior opportunity for discovery. At a hearing in September 1997, Plaintiff stated that she desired to call Dr. Hanosh as a witness also. The trial court denied Plaintiff's second motion.

{14} Finally, Plaintiff's third motion sought a change of venue. At a hearing on September 2, the court considered several affidavits filed by Plaintiff, including the affidavit of a jury consultant. Plaintiff requested a specific "evidentiary" hearing. The court denied her motion for an evidentiary hearing and also denied the request for a change of venue.

## 2. Trial Proceedings

{15} The case was tried in mid-January 1998. Before the trial began, Plaintiff reiterated her objection to Defendants' presentation of a comparative-fault case. Once again, the trial court rejected Plaintiff's argument, this time expressly ruling that Defendants could present evidence of comparative fault and the negligence per se of the assailant. In doing so, it admonished Defendants not to dwell extensively on the details of the criminal matter involving the assailant.

{16} During Defendants' opening statements, they both emphasized the assailant's guilt and generally presented a comparative-fault defense to the jury. The first point of Dr. Ortiz' counsel's opening was the details of the fight leading to the "brutal stabbing." She contended that it would be an injustice to blame Defendants for the assailant's wrongdoing. Upon objection by Plaintiff, the court informed Dr. Ortiz's counsel to proceed, and a brief exchange continued concerning the assailant's trial and conviction. Dr. Ortiz's counsel also indirectly referred to the assailant by stating that Dr. Ortiz was not the one who stabbed the victim. Counsel made no further mention of the assailant's criminality or liability during her opening statement.

{17} Dr. Samson's counsel also began his opening with the assailant's criminality and liability. He narrated the events leading up to the fight, describing how the patient was first drinking at several bars with a "transient," and that he was wearing "cowboy" clothes at the assailant's apartment and that the fight apparently started because of a "cowboy thing." Counsel for Dr. Samson revisited the assailant's criminality later in his opening, reading from both the criminal information and the judgment and sentence entered in the criminal case and stipulated as an exhibit at trial. He reminded the jury that the assailant was already found guilty of second-degree murder beyond a reasonable doubt for killing the patient. He further referred to the cause of death listed in the autopsy as "homicide." Dr. Samson's counsel argued during his opening statement that the case was not a medical malpractice case

but a case of "cowardly, back-stabbing murder."

{18} During trial, the parties disputed the time that Dr. Ortiz first contacted UNM Hospital regarding the patient. Dr. Ortiz testified that he first called UNM Hospital at 3:06 a.m. Plaintiff claimed that the 3:06 a.m. telephone call concerned the proposed transfer of another patient and that Dr. Ortiz first called UNM Hospital regarding this case at 3:57 a.m., based on telephone billing records. Due to the trial court's previous ruling regarding Plaintiff's motion to add additional witnesses, Plaintiff could not offer the testimony of Ms. Griner, or possibly Dr. Hanosh, to refute Dr. Ortiz' version of the 3:06 a.m. call.

{19} Plaintiff also attempted to discredit Dr. Ortiz by introducing the medical records of Dr. Hanosh. In a letter report from Dr. Hanosh to Memorial Hospital, there was no indication Dr. Hanosh thought himself or UNM Hospital responsible for any delays in his departure for Tucumcari. Additionally, Dr. Hanosh suggested he believed that, had he arrived in Tucumcari sooner, the patient might have survived. The trial court precluded this letter report for lack of foundation, despite Plaintiff's protestations that it was admissible under either the business records or "medical records" exceptions.

{20} The parties also disputed whether Defendants could have performed thoracic surgery without waiting for Dr. Hanosh to arrive from UNM Hospital and whether Defendants tardily inserted the chest tubes. Defendants argued that they lacked the proper equipment for a thoracotomy. Dr. Samson's expert witness, Dr. Carl Lagerstrom, stated during trial that he would have done "the things that [he has] learned to do that [he] knows[s] are effective in treating people and saving their lives." Plaintiff's expert witness, Dr. Michael Bartlett, an expert in emergency medicine, testified that he believed Defendants were capable of performing a thoracotomy with the equipment available to them. Dr. Bartlett also testified that Defendants inexcusably delayed both the blood transfusions and the insertion of the chest tubes and also should have immediately transferred the patient to UNM Hospital. He testified that, with proper medical intervention, the patient's chances of survival "were well in excess of 50%." Additionally, in response to the question whether the patient had a better than ninety percent chance of survival, the doctor said he thought that there was.

{21} Before closing arguments, Plaintiff and Defendants both submitted jury instructions on comparative fault. Plaintiff failed to request a jury instruction on either apportionment of the patient's injuries based on proximate cause or on possible enhancement of his injury arising from Defendants' negligence. Plaintiff objected to Defendants' instruction on negligence per se. The jury was eventually instructed on the assailant's and Defendants' comparative fault and negligence per se.

{22} During closing arguments, counsel for Dr. Ortiz stated that, as a matter of proximate cause, the assailant alone was responsible for the patient's death. Dr. Samson's counsel emphasized the assailant's wrongdoing to a greater degree, twice characterizing the case as "cowardly, back-stabbing murder," that the assailant had already been found responsible for the patient's death beyond a reasonable doubt, and that justice had been served when the assailant was convicted and sentenced for second-degree murder. He again read from the autopsy report, citing its finding that "homicide" was the cause of death.

{23} Essentially, then, both Defendants contended during closing arguments that the assailant's criminal liability for the stabbing absolved Defendants of any civil liability for their alleged subsequent malpractice. The jury returned a verdict for Defendants, finding that neither of them was negligent.

## II. DISCUSSION

### A. The Trial Court's Refusal to Reopen Discovery Several Months Before Trial for the Limited Purpose of Allowing Additional Witnesses Was an Abuse of Discretion

{24} Plaintiff first argues that the trial court abused its discretion in excluding Ms. Griner's testimony prior to the first trial

setting in July 1997. Because we reverse the trial court for its refusal to reopen discovery to allow additional witnesses at the trial in January 1998, we need not address the trial court's preclusion of Ms. Griner's testimony at the original trial date.

{25} Our rules in New Mexico favor liberal discovery, *see DeTevis v. Aragon*, 104 N.M. 793, 797, 727 P.2d 558, 562 (Ct.App. 1986), which allows the parties to develop their cases adequately. Liberal discovery enables the parties "to obtain the fullest possible knowledge of the facts before trial." *Marchiondo v. Brown*, 98 N.M. 394, 397, 649 P.2d 462, 465 (1982). The discretion granted to the trial court must be measured in light of this purpose. *See id.* at 398, 649 P.2d at 466. A trial court nevertheless has broad authority to manage pretrial discovery. *See DeTevis*, 104 N.M. at 797, 727 P.2d at 562.

{26} A party may also be precluded from presenting witnesses if the disclosure runs afoul of a pretrial order entered by the trial court. *See Blumenthal v. Concrete Constructors Co.*, 102 N.M. 125, 131, 692 P.2d 50, 56 (Ct.App.1984) ("The principle is well established that a pretrial order, made and entered without objection, and to which no motion to modify has been made, 'controls the subsequent course of action.'" (Quoting precursor to Rule 1–016(E) NMRA 1999)). The pretrial order is " 'the law of the case.' " *Gilmore v. Duderstadt*, 1998–NMCA–086, ¶ 13, 125 N.M. 330, 961 P.2d 175 (quoting *State ex rel. Highway Dep't v. Branchau*, 90 N.M. 496, 497, 565 P.2d 1013, 1014 (1977)).

{27} A court should modify a pretrial order to prevent "manifest injustice." Rule 1–016(E); *see also Fahrbach v. Diamond Shamrock, Inc.*, 1996–NMSC–063, 122 N.M. 543, 550, 928 P.2d 269, 276. This Court reviews a trial court's refusal to modify a pretrial order for an abuse of discretion. *See Fahrbach*, 1996–NMSC–063, 122 N.M. at 550, 928 P.2d at 276. New Mexico's Rule 1–016 was taken from Federal Rule of Civil Procedure 16, so we may look to federal precedent for guidance on this issue. *See Johnson v. Citizens Cas. Co.*, 63 N.M. 460, 464, 321 P.2d

640, 643 (1958). Both rules apply a "manifest injustice" standard. Fed.R.Civ.P. 16(e).

{28} In determining whether a trial court has abused its discretion by refusing to reopen discovery deadlines imposed under a pretrial order, federal courts have identified six factors:

> "1) whether trial [was] imminent, 2) whether the request [was] opposed, 3) whether the non-moving party would [have been] prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery [would have led] to relevant evidence."

*Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir.1990) (quoting *Smith v. United States*, 834 F.2d 166, 169 (10th Cir.1987)).

{29} Our review of the record indicates to us the significant presence of several of the six factors noted in *Sil–Flo* that would have warranted the amendment of the pretrial order in this appeal. Plaintiff essentially argued the substance of these factors in her motion to allow additional discovery and include additional witnesses. First, under the first factor, trial was not imminent at the time of Plaintiff's motion filed in July 1997. The trial had been rescheduled for January 1998. Second, Defendants have not asserted any prejudice on appeal under the third factor. Third, regarding the fifth factor, the trial court precluded all additional discovery at the time of Plaintiff's motion, so an extension of time was foreseeable for any future discovery.

{30} Concerning the sixth factor, we distinguish between the four new witnesses sought by Plaintiff. As Defendants point out, Ms. Faison and the witness from Amarillo would have likely provided cumulative testimony. Dr. Samson apparently stipulated to Ms. Faison's proposed testimony, namely that rib spreaders were available at Memorial Hospital on the night in question. The Amarillo witness would have testified about the feasibility of transferring patients from Tucumcari to Amarillo. Plaintiff's medical

expert, however, attested to this fact during trial. As a result, the trial court did not abuse its discretion in disallowing the depositions of these two witnesses on the ground that their testimony would be superfluous. *See, e.g., Davila v. Bodelson*, 103 N.M. 243, 253–54, 704 P.2d 1119, 1129–30 (Ct.App.1985) (trial court's error was harmless where excluded evidence was cumulative of other testimony).

{31} In contrast, however, Ms. Griner would have testified on factual issues central to the case. Plaintiff offered her testimony regarding UNM Hospital's procedures for responding to phone calls. She could opine on the reasons why UNM Hospital did not respond to Dr. Ortiz' alleged phone call at 3:06 a.m. for help with the patient. This testimony was highly relevant to both Defendants' standard of care and Dr. Ortiz' credibility as a witness in light of his testimony regarding the phone call.

{32} We recognize that Plaintiff could have timely identified Ms. Griner as a witness through diligent discovery far earlier than June 11, 1997, and that Defendants opposed Plaintiff's motion, considerations under the second and fourth factors. Even considering the fact that Defendants opposed Plaintiff's motion, however, we note there was no finding that Plaintiff's oversight was willful and that there was nothing in the record indicating that Plaintiff knew she would be calling Ms. Griner "at an earlier point in time and chose not to disclose their identities until it would be too late for [Defendants] to depose them." *Baca v. Velez*, 114 N.M. 13, 16, 833 P.2d 1194, 1197 (Ct.App.1992); *see also Shamalon Bird Farm, Ltd. v. United States Fidelity & Guar. Co.*, 111 N.M. 713, 715–16, 809 P.2d 627, 629–30 (1991). In summary, we conclude that the six factors balance in Plaintiff's favor.

{33} Additionally, the trial court refused to amend or alter its pretrial order despite the fact that the pretrial order's discovery deadline of June 27 explicitly pertained to the earlier trial date on July 14, 1997, which was vacated. The pretrial order itself expressly reflected the court's intention to allow discovery until approximately twenty days before trial.

{34} For these reasons, we conclude that the court abused its discretion in prohibiting discovery of Ms. Griner several months before the trial rescheduled in January of 1998. There was no support in the record to warrant such a drastic limit in the timetable for discovery. Because we are reversing on the failure to allow discovery of Ms. Griner, it is not necessary to address the issue relating to Dr. Hanosh.

**B. The Trial Court Should Have Precluded the Issue of the Assailant's Comparative Negligence and Negligence Per Se on Plaintiff's Pretrial Motion**

**1. Preservation**

{35} Initially, we address Defendants' contention that Plaintiff failed to preserve this issue for appeal. "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App. 1987). In this case, Plaintiff filed a pretrial motion to exclude the assailant from being considered a concurrent tortfeasor. The motion cited *Lujan v. Healthsouth Rehabilitation Corp.*, 120 N.M. 422, 902 P.2d 1025 (1995), the same authority Plaintiff relies on in this appeal. Plaintiff thus fairly invoked a ruling of the trial court on this issue and preserved it for appeal. *See id.* (explaining liabilities of concurrent and successive tortfeasors).

{36} We are unpersuaded by Defendants' argument that Plaintiff failed to preserve this issue by failing to object to the trial court's jury instructions on comparative negligence. In so contending, Defendants rely on *Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 729, 688 P.2d 333, 339 (Ct.App.1984) (holding that party waived complaint regarding instruction where it did not raise specific objection), and *Romero v. Mervyn's*, 109 N.M. 249, 253 n. 2, 784 P.2d 992, 996 n. 2 (1989) ("Sufficiency of evidence to submit a case to a jury, or to support a verdict, cannot be raised on appeal unless the lack of substantial evidence on a material issue has been

specifically called to the trial court's attention by, e.g., a motion for a directed verdict, objection to instructions, or a motion for [judgment notwithstanding the verdict].")." The real issue in this appeal, however, is whether Defendants were successive tortfeasors as a matter of law and whether the trial court should have so determined. We believe that issue was preserved when Plaintiff filed her motion to preclude Defendants from arguing comparative fault by the assailant on the grounds that Defendants were successive tortfeasors. The trial court denied that motion.

{37} The issue on appeal, as we view it, is not whether Plaintiff failed to tender the proper instruction on successive tortfeasor liability. Instead, the question before us is whether the trial court should have, as a matter of law, excluded all mention during the trial of concurrent tortfeasor liability and the assailant's negligence per se, as irrelevant to the liability of Defendants against whom Plaintiff sought damages as successive, not concurrent, tortfeasors, as to the original liability of the assailant. The claimed error, we believe, essentially occurred during opening and closing arguments and throughout the trial, when Defendants argued the assailant's comparative fault to the jury. The "horse was out of the barn" before the jury was instructed, and Plaintiff's motion would have prevented the error. In this respect, Plaintiff's pretrial request served as a motion in limine seeking to withhold irrelevant and prejudicial information from the jury. She wanted to limit remarks and argument concerning the assailant's criminal or civil liability. The trial court, however, refused to do so.

## 2. The Trial Court Should Have Determined Prior to Trial That the Assailant Was Not a Concurrent Tortfeasor

{38} We agree with Plaintiff that the holding in *Lujan*, 120 N.M. at 425–26, 902 P.2d at 1028–29, would permit determination by a trial court of successive tortfeasor liability before trial. As other cases suggest, there may be times when such a determination cannot be made until some or all of the evidence has been adduced at trial. Such is not the case under the facts in this appeal, however, for the reasons we discuss below. Because the Supreme Court in *Lujan* considered the issues before it in the context of a summary judgment proceeding, it did not have the opportunity to provide guidance for a trial court to consider in addressing and applying successive tortfeasor liability to the manner in which the trial proceedings are conducted. Because we are remanding this appeal for a new trial, for the trial court's guidance, we take this opportunity to provide the analysis and procedure that should be followed in the course of a trial that may involve successive tortfeasor liability.

{39} In *Lujan*, a personal injury plaintiff sustained a broken leg in an automobile accident. He signed a release discharging the defendant motorist and "all *other persons* ... *who* ... *may be jointly or severally liable* to the Releasors ... *for damages* to Releasors' person ... *arising out of an accident on or about January 27, 1990*, at the intersection of Blake and Tapia, SW, Albuquerque, New Mexico." 120 N.M. at 423–24, 902 P.2d at 1026–27. After executing the release, the plaintiff sued Healthsouth, alleging that its employee improperly manipulated plaintiff's leg in March 1990, refracturing the original break. *See id.* at 424, 902 P.2d at 1027. Healthsouth moved for summary judgment on the ground that plaintiff's release barred the medical malpractice claims. *See id.* The trial court granted summary judgment, and this Court affirmed. Our Supreme Court, however, reversed, holding that the general release did not bar claims "against a successive tortfeasor whose liability is limited to an injury enhancement *arising out of the subsequent malpractice.*" *Id.* at 423, 902 P.2d at 1026.

{40} Despite the procedural differences between *Lujan* and this case, we believe *Lujan*'s holding and discussion concerning successive tortfeasor liability are relevant here where the case proceeded to a jury trial on the merits and will do so again on remand. We also realize that the specific question before our Supreme Court in *Lujan* was different. The issue there was whether the release form signed by the plaintiff precluded

the plaintiff from later seeking damages against the defendant for malpractice as a result of alleged injury enhancement after the initial accident. But to answer that question, the Court was required to apply its analysis, as a matter of law, to conclude that the defendant in a medical malpractice context was a successive, not a concurrent, tortfeasor. That is precisely the question that was before the trial court below and is now before us on appeal. We thus consider the analysis and holding in *Lujan* not only instructive but binding.

▆ {41} The Court in *Lujan* determined successive tortfeasor liability as a matter of law on a summary judgment motion, thus illustrating that a court can make that determination without hearing evidence. *See id.* at 425–26, 902 P.2d at 1028–29. Based on the facts concerning the plaintiff's original injury, malpractice claims, and refracture, the Court determined that Healthsouth was a successive tortfeasor. *See id.* at 423–26, 902 P.2d at 1026–29. Similarly, the trial court here, under the particular facts in this appeal, could have determined Defendants' successive tortfeasor liability based on Plaintiff's motion. An important consideration, in this regard, is that Plaintiff stipulated to the assailant's stabbings. Plaintiff also alleged that Defendants' negligence enhanced the patient's original injury. In our view, that is all the trial court needed to know to alert it to Plaintiff's liability theory. More specifically, for the reasons that follow, we believe this information sufficed to preclude argument and evidence of the assailant as a concurrent tortfeasor.

▆ {42} "When the negligent acts or omissions of two or more persons combine to produce a single injury, the law considers those persons concurrent tortfeasors." *Lujan,* 120 N.M. at 425, 902 P.2d at 1028. In such cases, " 'two or more causes combine to produce ... a single result, *incapable of any reasonable division.*' " *Id.* (alteration in original) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 52, at 347 (5th ed.1984)). New Mexico has abolished joint and several liability among concurrent tortfeasors, and each such tortfeasor is liable for their respective share of

the damages based upon the comparative fault of each. *See id.*

▆ {43} In contrast, two tortfeasors combining to produce divisible and causally distinct injuries are considered successive tortfeasors. In *Lujan,* our Supreme Court held as a matter of law, based on the facts in that case, that Healthsouth and the defendant motorist (the original tortfeasor) were "not concurrent tortfeasors; they [were] successive tortfeasors by reason of divisible and causally-distinct injuries." *Id.* at 425–26, 902 P.2d at 1028–29. Having so held, the Court, in passing, identified five relevant "factors" that some courts have considered in determining whether a tortfeasor is concurrent or successive in a given case. The Court, however, did not take those factors into account, nor did it need to under the facts in *Lujan.* Neither do we in this appeal. Instead, we interpret *Lujan* to hold that in a medical malpractice case with facts similar to those found in *Lujan* and in this appeal, the medical care provider is a successive, not a concurrent, tortfeasor solely by reason of divisible and causally-distinct injuries. Consideration of the five factors is not necessary in such a factual context. The Court in *Lujan* also held that "[a] *Bartlett*-style apportionment of fault is inapplicable to a successive and distinct enhancement of an original injury at the hands of a subsequently negligent physician." *Id.* at 426, 902 P.2d at 1029 (referring to *Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 646 P.2d 579 (Ct.App.1982)).

▆ {44} Whether a tort committed by a tortfeasor is concurrent or successive can be determined as a question of law. *See Lujan,* 120 N.M. at 425–26, 902 P.2d at 1028–29. The factors mentioned but not adopted by *Lujan* generally turn on the allegations of the parties, specifically, the "alleged negligence" and the "causes of action," and *not* necessarily on the evidence presented during trial. *Id.* Any one or more of the factors, we submit, may assist a trial court in determining whether a tortfeasor is concurrent or successive, under facts different from those present here and in *Lujan.* In some cases, as we previously observed, a trial court may not be able to determine whether two defen-

dants are concurrent or successive tortfeasors before trial. Indeed, Defendants cite several cases in which the trial court was not presented with sufficient grounds to determine whether the damages were apportionable based on proximate cause. *See Glomb ex rel. Salopek v. Glomb,* 366 Pa.Super. 206, 530 A.2d 1362, 1365 (1987) (finding that a "court can direct the apportionment of liability among distinct causes only when the injured party suffers distinct harms or when the court is able to identify 'a reasonable basis for determining the contribution of each cause to a single harm,' " in a case involving indivisible injury at the hands of a babysitter and negligent parents (quoting Restatement (Second) of Torts § 433A(1) (1965))); *Mathews v. Mills,* 288 Minn. 16, 178 N.W.2d 841, 842, 846 (1970) (plaintiff involved in two almost simultaneous accidents); *Pang v. Minch,* 53 Ohio St.3d 186, 559 N.E.2d 1313, 1315–16, 1323–24 n. 4 (1990) (plaintiff suffered injuries from successive auto accidents). A law review note by Brady C. Pofahl, *Tort Law–Original and Successive Tortfeasors and Release Documents in New Mexico Tort Law: Lujan v. Healthsouth Rehabilitation Corporation,* 27 N.M.L.Rev. 697 (1997), discussing our Supreme Court's opinion in *Lujan,* recognized the problem that might arise in some instances:

The *Lujan* decision creates two primary problems with regard to the distinction between concurrent and successive tortfeasors. First, an application of the five factors [that] the court used to distinguish between concurrent and successive tortfeasors may not always render a clear distinction between the two types of tortfeasors in many multiple injury fact patterns. Take for example the following: an original tortfeasor, in an automobile, hits a pedestrian who falls in the street and breaks his leg. A few seconds later, a speeding drunk driver crosses the median and hits the pedestrian in the same leg, possibly causing an enhanced injury to that leg. The end result is a single broken leg caused by two separate acts of negligence [that] may, or may not, be compared under the *Lujan* decision.

*Id.* at 707 (footnote omitted).

{45} Under *Lujan,* the trier of fact should apportion a plaintiff's damages between the original and successive tortfeasors, regardless of whether both are joined by the plaintiff. *See Lujan,* 120 N.M. at 426–27, 902 P.2d at 1029–30. This apportionment is not based on the comparative fault of each tortfeasor but based on the damages proximately caused by each separate act. *See id.* at 427, 902 P.2d at 1030. Under this concept of apportionment, if the plaintiff sues the successive tortfeasor, that party is responsible to the plaintiff for the entirety of an enhanced injury but is not responsible for any harm caused before the enhancement. *See id.*

{46} In *Lujan,* the Court declined to apply *Bartlett* comparative-fault analysis to successive tortfeasors. *See Lujan,* 120 N.M. at 426, 902 P.2d at 1029. *Lujan* refused to extend to successive tortfeasors the benefit of the *Bartlett* exception to joint and several liability. A successive tortfeasor's liability for the enhancement to the original injury is not accurately described as joint and several. Successive tortfeasors are simply liable for the entire enhancement if proximately caused by their negligence. *See Lujan,* 120 N.M. at 426–27, 902 P.2d at 1029–30.

{47} Similarly, NMSA 1978, § 41–3A–1(A) (1987), enacted after *Bartlett* and entitled "Several [L]iability," abolished joint and several liability "[i]n any cause of action to which the doctrine of comparative fault applies." It also prohibits the application of comparative fault to successive tortfeasors:

Where a plaintiff sustains damage as the result of fault of more than one person which can be causally apportioned on the basis that distinct harms were caused to the plaintiff, the fault of each of the persons proximately causing one harm *shall not be compared* to the fault of persons proximately causing other distinct harms. Each person is severally liable only for the distinct harm which that person proximately caused.

Section 41–3A–1(D) (emphasis added). Under this statute, the fault of a successive tortfeasor "shall not be compared" to the fault of an original tortfeasor. Instead, the

successive tortfeasor remains liable to the plaintiff for the entire enhancement that person proximately caused.

{48} Although *Lujan* did not rely on Section 41–3A–1, the case accurately limited an original tortfeasor's rights against the successive tortfeasor to indemnification, not contribution based on comparative fault. *See Lujan*, 120 N.M. at 427, 902 P.2d at 1030.

{49} In summary, under *Lujan*, damages should be apportioned between successive tortfeasors based upon proximate cause. Their respective liability should not be dependent upon their comparative fault, as with concurrent tortfeasors. In a medical malpractice context, the fault of the original tortfeasor, as opposed to the harm caused, does not play a part in the jury's consideration of the successive tortfeasor's liability to the plaintiff. Those determinations made in *Lujan* are controlling in our consideration of what occurred before and during the trial in this case.

{50} The jury was properly presented with evidence detailing the extent of the patient's injuries at the hands of the assailant as part of the relevant medical evidence for determining the proximate cause of his death, alleged to be Defendants' fault. But evidence of the assailant's fault, that is, his criminal liability or his negligence, was irrelevant and improper to a determination of Defendant's liability by the jury. *See* § 41–3A–1(D); *Lujan*, 120 N.M. at .426–27, 902 P.2d at 1029–30. Obviously, once it could be determined that Defendants were successive and not concurrent tortfeasors, the trial court must consider and give to the jury the proper instructions on successive tortfeasor and not concurrent tortfeasor liability, as occurred at trial here.

{51} The trial court's denial of Plaintiff's motion erroneously permitted Defendants' strategy to introduce the assailant's comparative negligence, indeed, his negligence per se, to the jury. The court thus essentially allowed Defendants to present a comparative negligence case and to successfully argue, based on the assailant's criminal conviction beyond a reasonable doubt, that the assailant, not Defendants, proximately caused the patient's death. Indeed, the opening arguments of both Defendants stressed the assailant's criminal and civil liability for the entire injury, including the patient's death. This irrelevant evidence of the assailant's fault erroneously distracted the jury from properly examining Defendants' causation without comparisons to the assailant's negligence, as required by *Lujan*.

{52} Defendants rely on *Martinez*, 107 N.M. at 271, 755 P.2d at 609, for the proposition that they were entitled to offer evidence of the assailant's negligence to allow the jury to compare the percentage of total liability among the three parties. In *Martinez*, the plaintiff sued a physician for malpractice after suffering injuries at the hands of a nonparty driver of an automobile. *Martinez* held that the jury could not apportion fault between the driver and the physician without presenting. evidence of the driver's negligence, suggesting that the physician should have joined the driver. *See id. Martinez* strongly implied that "if the negligence of the pickup truck driver had been established, the jury properly could have apportioned his fault with that of the treating physician and then could have reduced the physician's liability for the plaintiff's enhanced injury in proportion to the driver's fault." *Lujan*, 120 N.M. at 424, 902 P.2d at 1027 (citing *Martinez*, 107 N.M. at 271, 755 P.2d at 609).

{53} In light of the later ruling in *Lujan* and Section 41–3A–1, which statute was not in effect at the time *Martinez* was filed, we decline to apply the implied holding of *Martinez*. In *Martinez*, this Court apparently assumed that *Bartlett* abolished joint and several liability for both concurrent and successive tortfeasors and that the fault of successive tortfeasors should be compared to determine their respective liability to the plaintiff. *See Martinez*, 107 N.M. at 270, 755 P.2d at 608. To the extent *Martinez* could be read to have held that the physician's liability for the plaintiff's enhanced injury could be reduced in proportion to the driver's fault, we conclude that such holding in *Martinez* was superseded and modified by our Supreme Court in *Lujan* and by Section 41–3A–1. *See Pofahl, supra*, at 697 (In ruling that successive tortfeasors are liable only for

the distinct injuries that they cause, "[*Lujan*] overruled the suggestion in *Martinez* ... that successive tortfeasors could apportion fault for the causally distinct second or successive injury with original tortfeasors." (Footnote omitted)).

{54} We conclude that the trial court erroneously failed to determine as a matter of law that Defendants were successive tortfeasors and not concurrent tortfeasors. This error allowed Defendants to improperly inject issues of the original tortfeasor's comparative negligence and negligence per se to the jury during the entire course of the trial.

{55} In addition to the analysis previously discussed, we offer the following guidelines for trial courts to observe. In the event that a trial court can determine as a matter of law before trial that a plaintiff's case presents a successive-tortfeasor-liability question, after considering the five factors enumerated in *Lujan,* the court should instruct counsel to refrain from arguing a comparative-negligence theory during trial involving the original tortfeasor(s). If the trial court is unable to make such a determination before trial, the court should nevertheless instruct counsel not to argue a comparative-negligence theory to the jury. If evidence is adduced during trial to permit the trial court to make such a determination one way or the other (concurrent tortfeasor liability versus successive tortfeasor liability) as a matter of law, the trial court should submit the appropriate instructions to the jury on the proper tortfeasor liability theory founded on the evidence presented and permit counsel to argue the evidence and applicable liability theory accordingly during closing arguments.

{56} In our view, there are two important differences between our approach and the approach taken by the dissent. The first of these is that the thrust of our focus is in the trial court's denial of Plaintiff's motion to preclude Defendants from arguing comparative fault by the assailant in a case that involved Defendants as successive tortfeasors. The dissent, on the other hand, applies its rationale and discussion of Restatement (Third) of Torts: Apportionment of Liability, § 50, to the production of evidence required of a plaintiff attempting to show that plaintiff's injuries are divisible. The dissent then, does not address the problem of a party prematurely injecting a theory of liability that is not warranted by the facts. We believe that if the facts of a particular case warrant the argument by either a plaintiff or a defendant that the theory of liability is one of successive and not concurrent tortfeasor liability, or vice versa, then the party arguing such liability has the burden of adducing evidence not only of the negligence of the tortfeasor but of the divisibility or indivisibility of the injury. It is a matter of proof for the factfinder's consideration and required of the party asserting the liability theory. Proper instructions to a jury in that regard will assure that a party's theory is properly considered by the jury. The ultimate effect of the trial court's denial of Plaintiff's motion, which as we noted previously, we view as a motion in limine, was to inject a false issue in the trial from which there was no retreat. The error was later compounded when the trial court instructed the jury on the law of concurrent tortfeasor liability, a theory clearly not applicable under *Lujan.* The jury, as trier of fact, would ultimately decide the question of whether there was a failure of proof. Plaintiff was unable to present her theory without the taint of comparative negligence injected by Defendants. Consequently, the dissent's attempt to reject Plaintiff's theory of successive tortfeasor liability because of an asserted failure of proof is, in our view, a red herring.

{57} This brings us to the second important difference between the dissent's and our approach. We believe, on the one hand, that our interpretation of *Lujan*'s holding is correct. Likewise, we believe that, based on the facts in *Lujan* and the facts in this appeal, we are bound by our Supreme Court's holding. The dissent, on the other hand, in applying its own rationale and the pronouncements of Section 50 of the Restatement, apparently takes issue with *Lujan*'s clear holding, as well as its rationale. Additionally, the dissent not only attempts to distinguish *Lujan* factually, but chooses to criticize the basis of its holding. We believe that if *Lujan* is to be revisited, in light of the Restatement's recent pronouncement under

Section 50, it should be our Supreme Court, not our Court, that should do so. We should add, however, that Section 50, as interpreted by the dissent, is not the law in New Mexico.

{58} The dissent correctly notes that the fundamental issue is one of apportionment of liability for damages where harm is created by multiple causes. The causes may operate simultaneously (or nearly so) or they may be separated by a significant amount of time. We should note that, in this regard, it is not of any consequence under the facts in this appeal that the alleged medical malpractice took place only minutes or hours after the original tort and that the alleged malpractice in *Lujan* occurred a month or so later. The divisibility of the alleged injury in both cases is clear. We believe *Lujan* provides a reasonable approach to the issue in the type of factual scenario we have here—an action for medical malpractice allegedly occurring during treatment of a prior injury. For that reason, as we previously noted, given the similarity of our facts to those in *Lujan*, we view *Lujan* as controlling.

{59} To some extent, it appears that the dissent does not directly question our interpretation or application of *Lujan*. Rather, it argues that *Lujan*'s approach to the problem of apportionment is incorrect and suggests a completely different, perhaps radical, analysis. It suggests, for example, that the starting point of the analysis should be whether the injury is factually divisible by cause. It thus proposes that the analysis should begin at the end—the injury—then proceed backwards to the injury's constituent causes, if possible. If the injury cannot be divided as a factual matter into its distinctive causative components, the dissent proposes, it should be treated as indivisible. Indivisibility carries with it the consequence of potentially imposing full liability for the injury on any one of the causative agents. Responsibility can be divided or compared, but it is unclear whether the division is done on the basis of fault and culpability or on some other measure.

{60} New Mexico's comparative negligence system relies on the presumption that fault translates to—or is a reasonable proxy for—causation. It does not concern itself directly with causation, at least with regard to the factual division of an injury. The dissent's proposal, we submit, has the potential of overturning or altering this presumption and even our negligence system entirely. We see no need to complicate even further our system of tort law to address a problem that has been resolved in a reasonable manner by *Lujan*.

{61} We also note that the Restatement (Third) does not suggest that Section 50, as interpreted by the dissent, is the only solution to the problem of apportionment between "ordinary" tortfeasors and medical doctors. *See* Restatement (Third) section 7, cmt. e, ill. 2 (assuming that the torts of automobile drivers and medical doctors cause only a portion of the victim's damages, thus creating divisible injuries). The illustration echoes the approach taken by *Lujan* without requiring the multiple factual investigations described by the dissent. It is even unclear under Section 50 whether a plaintiff would have any responsibility to prove divisibility as such when there is no question of his or her own comparative negligence. According to Section 50, comment g., injuries are indivisible when "all legally culpable conduct of the plaintiff and every tortious act of the defendants and other relevant persons caused all the damages." We should note that *Lujan* addressed the issue in this context by essentially holding that, if the medical malpractice causes injury, that conduct and its consequences are separate from the original injury. See Restatement, section 7, cmt. m.

{62} Finally, the dissent questions the viability of the indemnification principles addressed in paragraph 17 of *Lujan*. We merely point out that the discussion in paragraph 17 was not necessary to *Lujan*'s holding and is thus dicta. The potential for indemnification of the original tortfeasor in this case is nonexistent. It should not be used as a straw man argument against the applicability of *Lujan* to the facts in this appeal.

### C. The Trial Court Afforded Plaintiff an Evidentiary Hearing on Its Motion for a Change of Venue, and Its Denial of the Motion Was Not an Abuse of Discretion

{63} Change of venue is governed by NMSA 1978, § 38–3–3 (1965), under

**284**

which a party may move to change venue to a different county for sufficient cause stated in the affidavit of the party, his or her agent, or attorney. Upon motion of a party, "the court may require evidence in support thereof, and upon hearing thereon shall make findings and either grant or overrule said motion." NMSA 1978, § 38-3-5 (1929). Under this rule, if a party moves for a change of venue and submits an affidavit in support of the motion stating that a fair trial cannot be held on account of local prejudice, the court shall allow the movant to present evidence in support of this allegation and then determine the merits of such allegations. *See Schultz v. Young,* 37 N.M. 427, 430, 24 P.2d 276, 278 (1933). In *Schultz,* our Supreme Court reversed the trial court's decision to refuse additional evidence upon being presented with a mere averment by counsel's affidavit. *See id.* at 430-31, 24 P.2d at 278.

{64} Denial of a motion to change venue is reviewed for an abuse of discretion. *See State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991). The trial court must receive evidence upon which it can make findings of fact. *See McCauley v. Ray,* 80 N.M. 171, 175, 453 P.2d 192, 196 (1968). If the record lacks substantial evidence, the trial court has abused its discretion. *See id.* at 176-77, 453 P.2d at 197-98.

{65} In support of her motion for a change of venue, Plaintiff submitted her counsel's affidavit and the affidavit of a jury consultant. Both affidavits contained numerous averments of fact regarding the previous conduct of the jury during voir dire and of the jury pool in general at the time of the first trial attempt in July of 1997. The court reviewed these affidavits but refused Plaintiff's request to present live testimony in support of her motion. Plaintiff argues that, under *Schultz,* these affidavits were merely procedural requirements for an evidentiary hearing and not evidence by themselves. Plaintiff thus contends that the trial court should have allowed her to present live testimony in addition to the affidavits.

{66} We disagree with Plaintiff's reading of *Schultz.* The Court in *Schultz* considered an affidavit by the movants stating their belief that they would not be able to secure a

fair trial in the county where the cause was pending. *See Schultz,* 37 N.M. at 428, 24 P.2d at 277. Certainly, the court needs to hear sufficient evidence upon which to base a ruling. *See McCauley,* 80 N.M. at 175, 453 P.2d at 196. It did so in this case by considering the affidavits of counsel and the jury consultant. Had Plaintiff only submitted an affidavit of her counsel containing merely a general averment that Plaintiff could not receive a fair trial in Quay County, as occurred in *Schultz,* the trial court may have been required to allow additional evidence in support of or in opposition to the motion, which presumably could have consisted of the jury consultant's affidavit as well as other evidence. *See, e.g., V.P. Clarence Co. v. Colgate,* 115 N.M. 471, 472, 853 P.2d 722, 723 (1993) (counsel's arguments are not evidence). We believe, however, that the affidavits of either Plaintiff's counsel or the jury consultant constituted sufficient evidence on which to base a ruling. Counsel's factual averments in her affidavit are evidence, not mere arguments. Similarly, the jury consultant's affidavit detailed the consultant's sworn personal observations of the various jury members and thus also constituted evidence on which the trial court could base a ruling. Dr. Samson's counsel also submitted his affidavit as evidence opposing the motion.

{67} We are thus presented with the narrower question of whether the trial court abused its discretion by limiting evidence to these three affidavits and not considering "live testimony." Generally, a trial court has the discretion to exercise reasonable control over the presentation of cumulative or repetitious evidence in order to prevent needless delay and inconvenience and to expedite matters. *See* Rule 11-611(A) NMRA 1999; *see generally Pierce v. Albertson's Inc.,* 1996-NMSC-009, ¶ 15, 121 N.M. 369, 911 P.2d 877. A review of the two affidavits offered by Plaintiff in support of her motion indicates to us that both of them appeared to comprise the entire factual basis for Plaintiff's motion, that each affidavit included all relevant facts known to each affiant, and that additional testimony would be redundant. The trial court was also free to impute greater credibility to the affidavit of Dr. Samson's counsel.

{68} We therefore conclude that the trial court did not abuse its discretion in limiting the evidence to be considered by it to what was contained in the affidavits submitted by the parties. Our disposition of this issue does not preclude either party from requesting a change of venue on remand for a new trial.

## III. CONCLUSION

{69} We hold that the trial court abused its discretion in denying Plaintiff's motion to reopen discovery for the purpose of adding Ms. Griner and Dr. Hanosh as witnesses. For this reason, we reverse the trial court's judgment and remand for a new trial and further proceedings consistent with this opinion. We also hold that the trial court should have granted Plaintiff's motion to exclude evidence of the assailant's comparative fault and negligence per se from consideration by the jury and submitted appropriate instructions to the jury on Plaintiff's successive-tortfeasor-liability theory. We conclude, however, that the trial court did not abuse its discretion in denying Plaintiff's change of venue motion. Because of our disposition, we need not address Plaintiff's remaining issue and arguments. Plaintiff is awarded costs on appeal.

{70} **IT IS SO ORDERED.**

BUSTAMANTE, J., concurs.

HARTZ, J., concurs in part, dissents in part.

HARTZ, Judge (concurring in part, dissenting in part).

{71} I agree that a new trial is required because of the district court's refusal to permit Plaintiff to call Penny Griner as a witness. This case is different from *Reaves v. Bergsrud*, 1999–NMCA–075, 127 N.M. 446, 982 P.2d 497. In that case we recognized that when a district court orders a deadline for disclosure of witnesses, particularly expert witnesses, the district court has broad discretion to refuse to grant relief from the deadline. *See id.* Trial judges must be permitted to control such matters to keep litigation from getting out of hand. But here, Plaintiff disclosed Griner as a witness before any deadline imposed by a court order. I hope that the combination of the opinions in

*Reaves* and this case will encourage the district courts to set and enforce discovery deadlines.

{72} My disagreement with the majority concerns the discussion of successive (or, better, divisible) injuries. How should the courts deal with a claim by a person who suffers an injury caused by one tortfeasor and who then is allegedly further injured by a second tortfeasor? In the case on appeal, the patient was stabbed and then was allegedly subjected to medical malpractice causing his death. The question also arises when a person is injured by successive motor vehicle accidents, as in a chain-reaction crash, or when a person injured in a motor vehicle accident is then further injured because of defects in the vehicle, as when a seat belt fails and the occupant is ejected from the vehicle.

{73} In my view, the proper approach is that set forth in Restatement (Third) of Torts: Apportionment of Liability § 50 (1999) (hereinafter Restatement), recently adopted by the American Law Institute, not the approach adopted by the majority. In particular, I would hold that a plaintiff is not entitled to instructions treating the plaintiff's injuries as divisible unless the plaintiff produces evidence showing what damages would have been suffered if the alleged "successive tort" had not occurred. In the present case, Plaintiff had the burden to prove what damages the patient would have suffered from the stabbing had there been no alleged malpractice. Although Plaintiff could probably produce that evidence on retrial, she did not do so at the first trial; therefore, the district court did not err in its instructions or other rulings on the issue of "successive tortfeasors."

{74} It is not clear to me what approach has been adopted by the majority for determining when torts are successive torts. To decide the case before us on appeal, the majority appears to say only that the facts here are like those in *Lujan v. Healthsouth Rehabilitation Corp.*, 120 N.M. 422, 426, 902 P.2d 1025, 1029 (1995), and therefore the tortfeasors must be treated as successive tortfeasors. In other words, the majority

finds it unnecessary to discuss the controlling legal principles to resolve this appeal; the result in *Lujan,* in their view, compels their conclusion, regardless of what the reasoning was in *Lujan.* For other cases, however, the majority appears to endorse a five-factor test derived from *Lujan. See ante* at ¶ 44 (the factors may assist court "under facts different from those present here and in *Lujan* "), ¶ 55 (courts should consider "the five factors enumerated in *Lujan* "); *see also ante* at ¶ 44 (quoting Brady C. Pofahl, *Tort Law—Original and Successive Tortfeasors and Release Documents in New Mexico Tort Law: Lujan v. Healthsouth Rehabilitation Corporation,* 27 N.M.L.Rev. 697, 707 (1997), which states that *Lujan* used the five factors "to distinguish between concurrent and successive tortfeasors"). Consequently, I should comment on the five-factor test as an alternative to the approach I would follow.

{75} The five factors are mentioned in one sentence in *Lujan. See* 120 N.M. at 426, 902 P.2d at 1029. *Lujan* took the list of factors from footnote 2 in William L. Prosser, *Handbook of the Law of Torts* § 46 (4th ed.1971). When one reads the footnote in its entirety and in the context of the paragraph to which it is attached, one may question whether the five-factor test is a useful way to approach the problem. The paragraph, together with footnote 2, states:

> The terms "joint tort" and "joint tortfeasors" have been surrounded by no little uncertainty and confusion. There have been various attempts to define them, and to propose tests [2] of one kind or another as to when this may be found to exist. An examination of the multitude of cases in which they are to be found leads to the conclusion that they have meant very different things to different courts, and often to the same court, and that much of the existing confusion is due to a failure to distinguish the different senses in which the terms are used, which often has had an unfortunate effect upon the substance of the law. Since a "joint tort" can have significance only in so far as it may involve some definite legal result, it is possible to approach the problem by distinguishing the various consequences which follow

from it, and to indicate how far they are related, or unrelated, to one another.

[2] Thus, the identity of a cause of action against each of two or more defendants; the existence of a common, or like, duty; whether the same evidence will support an action against each; the single, indivisible nature of the injury to the plaintiffs; identity of the facts as to time, place or result; whether the injury is direct and immediate, rather than consequential; responsibility of the defendants for the same *injuria,* as distinguished from the same *damnum.* See 1 Cooley, Torts, 4th Ed.1932, 276–278; Clerk and Lindsell, Torts, 8th Ed.1929, 58; *Brunsden v. Humphrey,* 1884, 14 Q.B.D. 141, 147; *Petcoff v. Pestoret Lawrence Co.* [sic], 1913, 124 Minn. 531, 144 N.W. 474; *Farley v. Crystal Coal & Coke Co.,* 1920, 85 W.Va. 595, 102 S.E. 265; The Koursk, [1924] P. 140.

(Footnote 1 omitted). I think it is fair to infer from the language of the passage that Dean Prosser himself was not endorsing the use of any of the listed factors. And the fact that all the authorities cited in the footnote predate the Federal Rules of Civil Procedure might raise a doubt about whether all the factors are relevant under current law. *Lujan* itself does not explain why any of the five factors is relevant (it introduces the list by saying merely that "courts have considered several other factors that are relevant," 120 N.M. at 426, 902 P.2d at 1029), nor did the *Lujan* court purport to apply the five-factor test to the case before it.

{76} What I would take from Prosser's treatise is not a five-factor test but an admonition to focus on the particular context in which the issue of successive, concurrent, or joint tortfeasors arises. The context of this case is the determination of how to apportion damages among tortfeasors who are responsible for distinct causes of a plaintiff's damages.

{77} The most reasonable approach to the issue in this context is the approach taken by the Restatement. Section 50 states:

Apportionment of Liability When Damages Can be Divided by Causation

(a) When damages for an injury can be divided by causation, the factfinder first divides them into their indivisible component parts. The factfinder then separately apportions liability for each indivisible component part [as provided elsewhere in the Restatement].

(b) Damages can be divided by causation when there is a reasonable basis for the factfinder to determine:

(1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and

(2) the amount of damages separately caused by that conduct.

Otherwise, the damages are indivisible and thus the injury is indivisible. Liability for an indivisible injury is apportioned [as provided elsewhere in the Restatement].

{78} The approach of Section 50 is a pragmatic, functional approach. The purpose—the function—of a personal injury action is to award damages. Damages are divisible if, *and only if,* the evidence persuades the jury that the damages can be divided into separate components that resulted from distinct (although perhaps overlapping) sets of causes. For example, the victim may suffer some lost future income from an initial injury and further lost future income from an aggravation of the injury. Absent evidence that damages can be divided, the damages are indivisible. To be more precise, an element of damages (such as lost future income) is "divisible" into two components only if the evidence shows that (1) the element of damages has two or more proximate causes (say, cause A of the initial injury and the additional cause B of the later aggravation) and (2) the element of damages can be divided into two measurable components (the loss of future income caused by the initial injury and the further loss caused by the aggravation), each of which was proximately caused by distinct sets of causes (say, cause A for the initial injury and causes A and B for the aggravation). For those whose conduct caused a particular component of the damages, liability is apportioned in accordance with the jurisdiction's rules regarding comparative responsibility. But one whose conduct was not a legal cause of the particular component of damages is not assigned any liability for that component.

{79} The Restatement approach avoids the confusion that can arise from use of the terms "concurrent tortfeasors" and "successive tortfeasors." Those terms suggest focusing on the temporal relationship between separate causes of the plaintiff's injuries; such a focus can cause one to miss the real issue—whether the jury has a basis for dividing the damages between two different causes or sets of causes.

{80} The Section 50 approach is consistent with NMSA 1978, Section 41–3A–1(D) (1987). That provision states that when harms can be apportioned by cause, the jury should compare the fault of only those who proximately caused each harm.

{81} The Restatement approach also appears to be consistent with New Mexico precedent. In *Lujan,* 120 N.M. at 426, 902 P.2d at 1029, our Supreme Court quoted with apparent approval the following statement from *Duran v. General Motors Corp.,* 101 N.M. 742, 749–50, 688 P.2d 779, 786–87 (Ct. App.1983): "[A] claimant in an enhanced injury case must prove that the defective design caused injuries over and above those which otherwise would have been sustained, must demonstrate the degree of 'enhancement', and 'must offer proof of what injuries, if any, would have resulted [in any event].' " (quoting *Huddell v. Levin,* 537 F.2d 726, 737 (3d Cir.1976)). In other words, a plaintiff can recover for enhanced injuries only by proving how the damages can be divided between those that resulted from the "original accident" and the additional damages resulting from the "second accident."

{82} Perhaps in one respect the Restatement departs from *Lujan* and *Duran.* The above-quoted language from the New Mexico opinions could be read as saying that plaintiffs cannot recover anything from the successive tortfeasor if they fail to prove "what injuries, if any, would have resulted in any event." If that were the case, then a victim of a motor vehicle collision who was thrown from the vehicle because of a defective seat belt could recover nothing from the manufacturer of the defective belt unless the victim could prove the damages that would have been suffered if the belt had been satisfactory. Section 50, however, would not necessarily require that result. If the defective seat belt is proved to be a proximate cause of the

victim's injuries, but no evidence establishes what damages would have been suffered by the victim if the seat belt had been satisfactory, then the victim's damages (and injuries) would be treated as indivisible. The jury would compare the responsibilities of any tortfeasors causing the crash with the responsibility of the seat belt manufacturer, and apportion the total damages accordingly.

{83} The Restatement approach, it should be noted, is neither pro-defendant nor pro-plaintiff. In any particular case it may be advantageous for the plaintiff or for the defendant to treat the damages as indivisible. In a defective-seat-belt case, the plaintiff would prefer that the damages be treated as divisible if (1) there would have been little damage suffered had the seat belt worked properly and (2) the tortfeasors who caused the accident were very negligent and underinsured. (If each tortfeasor were capable of paying the full damages, the plaintiff would not care how the damages were apportioned among them.) But the plaintiff would prefer that the injury be treated as indivisible if (1) most of the injuries would have occurred even if the seat belt had been satisfactory and (2) the tortfeasors causing the crash were barely negligent and underinsured. The seat belt manufacturer would generally have the opposite preference to that of the plaintiff. But the parties may be sufficiently uncertain regarding how the jury would view the evidence that both might, for example, prefer to take their chances on treating the injury as indivisible. Of course, a party who wishes the damages to be treated as divisible can always put on evidence that would permit such a division. The Restatement adopts the sensible approach that "[a] party alleging that damages are divisible has the burden to prove that they are divisible." Restatement, *supra*, § 50 cmt. h at 459. (Contrary to the majority's suggestion, *see ante*, ¶ 61, I do not read the Restatement as indicating that the plaintiff does not bear this burden when the plaintiff was not negligent or otherwise at fault.)

{84} Turning to the facts of the case before us, it may be useful to discuss how Section 50 would divide damages, assuming that Defendants committed malpractice and that all facts regarding the patient's injuries are resolved by the jury. I will not attempt to catalogue all possible elements of damages that could be recovered, but among them would be medical expenses, lost future earnings, and pain and suffering. First, Plaintiff could recover from Moses Griego, the assailant. At the least, Plaintiff could recover from Griego the damages the patient would have suffered if Defendants had not committed malpractice. The patient, I will assume, would have lived if there had been no malpractice. But the patient certainly would have incurred medical expenses—for treatment at the time of the stabbing, and perhaps also over future years. And there would likely be lost future earnings as well. Given the multiple stab wounds, assume that the jury would have found that the patient's life expectancy was reduced from 40 years to 15 years and that he could no longer perform heavy labor, so that his anticipated lifetime earnings, adjusted to present value, would drop from $500,000 to $100,000. As a result, Griego would be liable for $400,000 in lost future earnings. In addition to economic damages, Griego would be liable for non-economic damages, such as pain and suffering.

{85} Second, Plaintiff could recover for the aggravation of the patient's injuries caused by Defendants. The liability of Defendants for their malpractice would be for " 'injuries over and above those which otherwise would have been sustained.' " *Lujan*, 120 N.M. at 426, 902 P.2d at 1029 (quoting *Duran v. General Motors Corp.*, 101 N.M. 742, 688 P.2d 779 (Ct.App.1983). In other words, one would calculate the damages for the patient's death and subtract from that the damages that would have resulted had there been no medical malpractice. Thus, for example, Defendants could be liable for the patient's $500,000 in lost future earnings, less the $400,000 earnings loss caused by the stabbing alone, for a net of $100,000 in lost-earnings damages. The economic damages owed by Defendants could be reduced still further, if, as one might expect, the medical expenses for the patient arising from the stabbing would have been greater if he had lived than they turned out to be in fact. (Later in the opinion I will discuss whether

Griego should share liability with Defendants for the aggravation of the injuries.)

{86} As far as I can tell, the above discussion of how damages would be apportioned between the original injury and the aggravation is unexceptional. I am aware of no authority, including the majority opinion, to the contrary. My difference with the majority is not in how to apportion damages between the initial injury and the aggravation when evidence permits the jury to make the apportionment. My disagreement relates to (1) what evidence is necessary before the jury is entitled to apportion damages between the initial injury and the aggravation, (2) what happens if such evidence is lacking, and (3) if such evidence is present, who shares in the liability for the aggravation.

{87} As I understand Restatement, *supra*, § 50, there was insufficient evidence to establish a fully divisible injury in this case. To be sure, there is a difference between life and death, and an expert in this case testified that the patient would not have died if given proper medical care (although the jury did not have to believe the expert). But loss of life in itself (aside from the resulting lost earnings or lost pleasures of life) is at most only one element of damages. As for other elements of damages, death need not increase, and may even diminish, them. Consider loss of future earnings. One who survives an injury may have no ability to earn income in the future, so alleged fatal malpractice may not increase that element of damages whatsoever. Some other losses suffered by a survivor—such as pain and suffering and future medical expenses—are not suffered by one who dies. For that reason, juries often find that damages for wrongful death are less than those for seriously disabling the victim. To put the matter crudely, tortfeasors may find it cheaper to kill than to maim.

{88} Because there was no evidence regarding what damages the patient would have suffered had he lived, the jury could not divide any of the elements of damages in this case, with the possible exception of loss of life in itself, if that is an element of damages. (Of course, on remand the evidence may well suffice to make some or all elements of dam-

ages divisible.) Damages that cannot be divided must be treated as indivisible. As pointed out in the Reporters' Note to Section 50 of the Restatement, some damages in a case may be divisible while others are not.

> If the plaintiff's physical injuries are separate, such as a broken leg and a broken arm, some of the damages may be divisible, but some may be indivisible. For example, if the plaintiff could work with either a broken arm or a broken leg, but not with both, the broken arm and the broken leg each was a "but for" cause of the inability to work, and any lost wages are indivisible.

Restatement, *supra*, at 477. For the indivisible damages in this case, the responsibility of Defendants would properly be compared to that of Griego for purposes of assessing liability.

{89} I do not read *Lujan* as requiring us to hold that the patient's damages in this case were divisible. It is essential to keep in mind what the issue was in *Lujan*. The victim had been injured in a motor vehicle collision and then allegedly was further injured by the medical malpractice of defendant Healthsouth. The plaintiff settled with the other driver in the collision. When the plaintiff then sued Healthsouth, Healthsouth contended that it was released by the prior settlement. To decide whether Healthsouth was released, *Lujan* found it necessary to discuss how liability should be assigned when a health care provider's malpractice causes a successive injury. Nowhere in *Lujan* does the opinion indicate that it is resolving a dispute regarding whether Healthsouth caused an aggravation of a prior injury, whether there was a divisible injury, or whether the tortfeasors were successive tortfeasors. Those aspects of the case were taken as given. The appellate briefs of both parties asserted that the case involved successive tortfeasors.

{90} Hence, I cannot agree with the majority that *Lujan* required the district court in this case to hold as a matter of law that the alleged malpractice caused a divisible injury, an aggravation of the original injury. On the contrary, the evidence was insufficient to satisfy the *Lujan* requirement that

**290**

the claimant "demonstrate the degree of enhancement, and ... offer proof of what injuries, if any, would have resulted [in any event]." *Lujan*, 120 N.M. at 426, 902 P.2d at 1029 (internal quotation marks and citation omitted); *see* Restatement, *supra*, § 50. Moreover, even when there is sufficient evidence, the matter should still ordinarily be left to the jury. *See* Restatement, *supra*, § 50, cmt. 1 at 464 ("When there is conflicting evidence about these causal relationships or damages, a determination of whether the damages are divisible depends on findings about these facts. That may require special interrogatories.") The trial judge has sufficient power to ensure that the jury's decision is not improperly influenced by inflammatory evidence regarding the stabbing.

{91} Adopting the Restatement approach, and assuming that Plaintiff in this case did not prove the divisibility of damages, then there was nothing improper in Defendants' efforts to compare the responsibility of the assailant Griego with the alleged responsibility of Defendants themselves, so Plaintiff's motion in limine was properly denied. Indeed, there may well be future cases in which a plaintiff will want an injury considered as indivisible so that the jury will compare the responsibility of a doctor who is accused of malpractice with the responsibility of the tortfeasor who caused the condition treated by the doctor. To be sure, in this case Griego would likely be assigned a large share of responsibility, so indivisibility of the damages would be against Plaintiff's interests. But we should not change the rule of law from case to case in order to prefer one class of litigants over another.

{92} One issue remains. Assuming that the evidence persuades the jury that the patient's damages are divisible, who should bear liability for the aggravation of the original injury? In *Lujan* the Supreme Court said that Healthsouth should ultimately be solely liable for the entire enhanced injury. *See* 120 N.M. at 426, 902 P.2d at 1029. The court held that even if the original tortfeasor could be liable for harm caused by foreseeably negligent medical treatment, the original tortfeasor "can shift through indemnification the responsibility for an enhanced

injury" to the medical care provider. *Id.* at 427, 902 P.2d at 1030.

{93} This is an interesting result. Ordinarily, under the doctrine of comparative responsibility the factfinder compares the responsibility of all who proximately cause an injury. *See* § 41–3A–1(D). Since the original tortfeasor's act is a proximate cause of the aggravation arising from the foreseeable malpractice, one could assume that the original tortfeasor's responsibility should be compared with that of the health care provider and liability apportioned accordingly, just as with other concurrent tortfeasors. After all, with respect to the aggravation the original tortfeasor and the health care provider are concurrent tortfeasors because each was a proximate cause of the aggravation. This is the approach taken by the Restatement. *See* Restatement, *supra*, § 50(a); *supra*, cmt. d; *supra*, Reporters' Note to cmt. d. (Contrary to the assertion by the majority, *see ante*, ¶ 61, this is the only approach recognized by the Restatement. The majority's reliance on Restatement, *supra*, § 7 ill. 2, is misplaced. The illustration recognizes the possibility of divisible injuries, but it says absolutely nothing about whether the original tortfeasor shares in liability for aggravation of an injury caused by medical negligence.)

{94} It would make sense to relieve the original tortfeasor of any responsibility for the aggravation if the malpractice could be treated as an independent intervening cause. (The facts in *Lujan* might have supported such an analysis because the malpractice consisted of improperly manipulating the leg, refracturing the original fracture, more than a month after the motor vehicle accident. *See Lujan*, 120 N.M. at 423–24, 902 P.2d at 1026–27.) Yet even if the intervening-cause doctrine has continuing validity, *but cf. Torres v. El Paso Electric Co.*, 1999–NMSC–029, 127 N.M. 729, 987 P.2d 386, it would not enable the original tortfeasor to escape liability for the aggravation if the purported intervening cause was reasonably foreseeable, as may well be the case with medical malpractice.

{95} In any event, *Lujan* did not adopt an intervening-cause rationale. Rather, it relied on indemnification principles. Indemnifica-

tion " 'may ... arise without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory.' " *In re Consolidated Vista Hills Retaining Wall Litigation,* 119 N.M. 542, 546, 893 P.2d 438, 442 (1995) (quoting W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 51, at 341 (5th ed.1984)).

{96} In applying indemnification principles to a successive tortfeasor, *Lujan* relied on five decisions from other jurisdictions. *See Lujan,* 120 N.M. at 427, 902 P.2d at 1030. Not only does that authority appear to be inconsistent with the Restatement, but it has been distinguished by at least one court on the ground that most of the cases arose before the adoption of comparative responsibility or contribution among tortfeasors. *See Kemper Nat'l v. Smith,* 419 Pa.Super. 295, 615 A.2d 372, 378–79 (1992); *see also Lujan,* 120 N.M. at 427, 902 P.2d at 1030 (citing cases from Arizona and Kansas that rejected indemnification). Also, two of the five cases apparently are no longer good law in their own jurisdictions, at least to the extent that they are read as providing for complete indemnity against the health care provider. *See Western Steamship v. San Pedro Peninsula Hosp.,* 8 Cal.4th 100, 32 Cal.Rptr.2d 263, 876 P.2d 1062, 1064 (1994) (indemnification limited to hospital's proportionate fault); *Coleman v. Franklin Blvd. Hosp.,* 227 Ill. App.3d 904, 169 Ill.Dec. 840, 592 N.E.2d 327, 328–29 (1992) (there is no implied indemnity absent a pre-tort relationship between the successive tortfeasors).

{97} But even accepting *Lujan*'s adoption of an indemnification approach, I have difficulty seeing why it would be available here, given the rationale for indemnification. This is not a case where, as in *Lujan,* weeks after an accidental injury a medical care provider refractured the original fracture site. *See Lujan,* 120 N.M. at 424, 902 P.2d at 1027. Why should Griego be entitled to indemnification from Defendants? He stabbed the patient multiple times. The jury that convicted him of second degree murder was convinced beyond a reasonable doubt that Griego intended to kill the patient. The patient died only hours later. The record does not suggest that Griego arranged to take the patient to the hospital for care; it would not be surprising if Griego left the patient to die of his wounds. In that circumstance, would it be "regarded as unjust or unsatisfactory" to deny indemnification to Griego against Defendants? And if the indemnification rationale fails, then *Lujan* is distinguishable. (To say, as the majority does, *see ante,* ¶ 62, that the discussion of indemnity in *Lujan* was not necessary to the holding, is to say that no rationale whatsoever was necessary to hold Healthsouth solely liable for the aggravation of the injury.) Without a reason supporting indemnification, I would assume that principles of comparative responsibility would apply. In short, even if *Lujan* states a general rule regarding indemnity against health care providers, the facts here demand a different approach. Absent some rationale other than that provided by *Lujan,* the responsibility of Griego must be compared to that of Defendants.