867 P.2d 1167

Jacque M. OLDFIELD, Gilbert L. Oldfield, Jessica Rose Oldfield, a minor, and Shamra Michelle Oldfield, a minor, Plaintiffs–Appellees,

v.

Salvador BENAVIDEZ, Cibola County Sheriff, in his individual capacity, Arthur Fuldauer, social worker, in his individual capacity, and Georgia Sanchez, supervisor of the Grants, New Mexico, office of HSD, in her individual capacity, Defendants–Appellants.

No. 21534.

Supreme Court of New Mexico.

Jan. 12, 1994.

Herrera, Baird & Long, P.A., Judith C. Herrera and Nancy R. Long, Santa Fe, for appellants.

Kent Winchester and Vernon Salvador, Albuquerque, for appellees.

## OPINION

BACA, Justice.

Defendants–Appellants, Salvador Benavidez, Arthur Fuldauer, and Georgia Sanchez (Defendants), petition the Supreme Court to issue a Writ of Error based on the district court's denial of their motion for summary judgment on the issue of qualified immunity. This case arose out of an incident in which the Plaintiff children, Jessica and Shamra Oldfield, were removed from their home for a period of one week and subsequently monitored by the New Mexico Human Services Department (HSD). This action was predicated upon a report of physical and emotional abuse made by Jessica Oldfield. After the children were returned to their custody, Plaintiffs–Appellees, the Oldfields, filed a complaint for damages under 42 U.S.C. Sections 1983 and 1988. The Oldfields alleged violations of their right to familial integrity under the Fourth and Fourteenth Amendments and their right to criticize and complain about public officials under the First Amendment to the United States Constitution. They also alleged violations of procedural and substantive due process rights secured under New Mexico law.

Defendants moved for summary judgment on grounds of qualified immunity arguing there was no clearly established right to familial integrity. The court found, however, that there was a clearly established right to familial integrity and denied Defendants' motion. Pursuant to our decision in *Carrillo v. Rostro*, 114 N.M. 607, 845 P.2d 130 (1992), we review whether the district court erred in denying summary judgment on Defendants' qualified immunity defense.

## I

The material facts in this case, construed in a light most favorable to the Oldfields are

as follows: On January 30, 1991, Jessica Oldfield wrote a note to her teacher, Jeanette Rhoderick, following a lecture to the class on the dangers of drugs which stated: "Mrs. Rhoderick This is very sad to say but My mom and Dad use mariwana [sic]! I did not wont [sic] to tell Because I was scrade [sic] to Because my dad will wip [sic] me so hard Ill never be able to sit down agian [sic]. Please help, Please!!" Jessica's teacher, Mrs. Rhoderick, subsequently had a conversation with Jessica about the note. During the discussion, Jessica confirmed that she was afraid of being physically abused by her step-father, Mr. Oldfield, and revealed that she previously had been abused.

Rhoderick reported the possibility that Jessica was being physically abused to the school principal, Loretta Miller. Miller and Rhoderick, together, informed HSD. They did this according to New Mexico law that requires school teachers and school officials to report abuse or neglect if they have "reasonable suspicion" that a child is being abused or neglected. See NMSA 1978, § 32–1–15 (Repl.Pamp.1989) (repealed and recodified as NMSA 1978, § 32A–4–3 (Repl.Pamp. 1993)). HSD conducted three separate interviews before deciding to petition for an ex parte custody order. Georgia Sanchez, an HSD supervisor, interviewed Jessica twice on January 31. The first interview was with Jessica, Rhoderick, Miller, and a school counselor. The second interview was between Sanchez and Jessica only. Jessica was interviewed again on February 6 by Arthur Fuldauer, the caseworker assigned to investigate her allegations. Subsequent to these interviews, Fuldauer met with another HSD staff member and a member of the Sheriff's Department (who is not named as a Defendant) to discuss Jessica's situation. After the meeting, HSD presented a petition and an affidavit for an ex parte custody order which was granted by the District Court. The order required the Sheriff's Department to take Jessica Oldfield and her sister, Shamra Oldfield, from the Oldfield home and deliver them into HSD's custody. The order stated that because Jessica and Shamra were alleged to be neglected and abused it was necessary for their protection that they be placed in the custody of HSD.

Because the Oldfields lived outside the city limits and within the jurisdiction of Cibola County, the Sheriff's department was the party authorized by law to serve the order. The Oldfields were served with the order at the Sheriff's office because HSD previously had been informed by personnel at Jessica's school that on a prior occasion Mr. Oldfield had physically and verbally threatened the staff at the school. Consequently, school officials specifically requested that the ex parte custody order not be served on school premises. It was decided, based upon this information, that the order be served upon the Oldfields at the Sheriff's office in order to allow for a maximum amount of safety for the children and others. The entire Oldfield family was brought to the Sheriff's office and Mr. and Mrs. Oldfield were served with the order. The children were placed in foster care and the Oldfields were notified of the upcoming ten-day custody hearing regarding the children.

Subsequently, Fuldauer conducted a videotaped interview of Jessica and again she reported that her mother and step-father used drugs. She also reported that she had been hit with a belt many times by Mr. Oldfield. She was scared that he would seriously hurt her if she went home. A clinical psychologist, Michael Rodriguez, also interviewed Jessica and Shamra and Jessica again reported abuse. Rodriguez concluded that Jessica's fear was "genuine" and that a "hasty return home does not appear to be appropriate."

At the custody hearing, the district court entered an order stating that there was "probable cause to believe that the children will be subject to injury by others if not placed in the custody of the department." The order provided that legal custody of the children would remain with HSD pending adjudication and that physical custody of the children would be returned to the parents. The order also provided that Gilbert Oldfield should undergo counseling and that Jessica should complete her evaluation with Dr. Rodriguez. After the children returned, the Oldfields decided to send one child to each set of grandparents, one to Farmington and one to

California, for the remainder of the school year and for an indefinite time after that. Due to the absence of the children and Gilbert Oldfield's compliance with counseling, HSD moved to dismiss the action and the district court granted the motion.

The Oldfields filed a complaint against Sheriff Benavidez, Arthur Fuldauer and Georgia Sanchez alleging that Defendants conspired to petition for the ex parte custody order as retaliation against them for the Oldfields complaining about Sheriff Benavidez's alleged sexual harassment of Jacque Oldfield. The Oldfields contended that prior to Jessica reporting abuse to her teacher, Sheriff Benavidez, while still a deputy, visited the Oldfield home several times when Gilbert Oldfield was not present and solicited sexual intercourse from Jacque Oldfield. She rejected these advances and Gilbert Oldfield met with Ed Craig, who was the sheriff of Cibola County at the time, to complain. Craig testified in his deposition that he reprimanded Benavidez. Benavidez then allegedly threatened Gilbert that he would get even.

The Oldfields also alleged that Fuldauer "unprofessionally and unlawfully coached the children prior to their interrogations, misrepresented what they had stated in his testimony in the custody hearing, excluded evidence which was contrary to his predisposed hostility to the parents and drafted his reports with the intention of insuring that the children would be taken from the parents." The Oldfields alleged that Sanchez was aware of Fuldauer's conduct and failed to take any action to correct it. Finally, the Oldfields contended that HSD should have conducted further investigation before applying for an ex parte order and that the ex parte order was obtained by using false information from Benavidez and Fuldauer. In summary, the Oldfields alleged that Defendants conducted their investigation and made their decisions on the basis of retaliation and their predispositions against Plaintiff parents. Defendants' motion for summary judgment based on qualified immunity was denied by the district judge and they appeal to this Court.

## II

■ We first address whether the district court erred in denying Defendants' motion for summary judgment on the basis of qualified immunity. Summary judgment is appropriate only when "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Frontier Leasing, Inc. v. C.F.B., Inc.,* 96 N.M. 491, 493, 632 P.2d 726, 728 (1981). All factual disputes and inferences are construed in favor of the non-moving party. *See Wheeler v. Board of County Comm'rs,* 74 N.M. 165, 171, 391 P.2d 664, 668 (1964).

Defendants argue that the trial court erred in denying their motion for summary judgement because they are entitled to qualified immunity. Plaintiffs, on the other hand, argue that Defendants are not entitled to qualified immunity because Defendants conspired to temporarily remove their children from the home as retaliation for complaining about Sheriff Benavidez's harassment of Jacque Oldfield, and in so doing, violated their right to familial integrity. We cannot agree with Plaintiff's contentions.

■ The granting of qualified immunity results in immunity from suit rather than a mere defense to liability and is lost if a case is erroneously allowed to go to trial. Therefore, the district court's denial of summary judgment based on qualified immunity is appealable before a final judgment is rendered at the trial court level. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Generally, child welfare workers are entitled to qualified immunity "to ensure that an effective child-abuse investigation system exists." *Stem v. Ahearn,* 908 F.2d 1, 5 (5th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). It is an accommodation by the courts to the "conflicting concerns" of government officials seeking freedom from personal monetary liability and harassing litigation and injured persons seeking redress for the abuse of official power. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Qualified immunity shields government officials from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*

The qualified immunity doctrine requires summary judgment even if Plaintiffs' constitutional rights were violated "unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). The doctrine protects government officials performing discretionary functions from suit to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The test for qualified immunity is two pronged and requires us to determine: (1) whether at the time of the alleged conduct there was a clearly established constitutional right that was violated, and (2) whether a reasonable person would have known that his or her conduct violated that constitutional right. *Id.; Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038.

We begin our analysis with the first prong of the *Harlow* test and ask whether there was a clearly established right to familial integrity when HSD obtained temporary custody of the Oldfield children via an ex parte order. The right to familial integrity embodied in the Fourteenth Amendment, *see Griffin v. Strong,* 983 F.2d 1544, 1547 (10th Cir.1993), is a substantial right and one that has been clearly established by the Supreme Court in several cases. *See Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (unwed father has substantial interest in retaining custody of children born out of wedlock with whom he maintained strong parental relationship); *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953) (recognizing in dictum parents' right to "care, custody, management and companionship" of their children); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (stating that parents have a fundamental interest in the religious upbringing of children); *Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (stating that parents have a liberty interest in controlling the education of their children). We find these cases compelling and hold that there is a clearly established right to familial integrity embodied in the Fourteenth Amendment.

Having determined that the right to familial integrity is a clearly established right, we next discuss the second prong of the *Harlow* test and ask whether a reasonable person would have known that his or her conduct violated that constitutional right. This inquiry is fact specific. *See Griffin,* 983 F.2d at 1548. The Supreme Court recognized in *Anderson* that many constitutional rights are clearly established but at the same time so general that it is often unclear to officials whether particular conduct violated the right. 483 U.S. at 639, 107 S.Ct. at 3038. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. We find the right to familial integrity to be such a right. Although the general right to familial integrity is clearly established, the parameters of the right have never been clearly established, and the right is not absolute. or unqualified. "The state has a 'traditional and "transcendent interest" ' in protecting children from abuse and from situations where abuse might occur." *Griffin,* 983 F.2d at 1548 (quoting *Maryland v. Craig,* 497 U.S. 836, 855, 110 S.Ct. 3157, 3168, 111 L.Ed.2d 666 (1990)); *see also Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983) (relationship between parent and child merits constitutional protection in "some cases"); *New York v. Ferber,* 458 U.S. 747, 757, 102 S.Ct. 3348, 3355, 73 L.Ed.2d 1113 (1982) ("The prevention of ... abuse of children constitutes a government objective of surpassing importance...."); *Prince,* 321 U.S. at 166, 64 S.Ct. at 442 ("[T]he family itself is not beyond regulation in the public interest). Although parents have certain rights regarding their children, the children also have certain fundamental rights which often compete with the parents' interests. *See Woodrum v. Woodward County,* 866 F.2d 1121, 1125 (9th Cir.1989) (though liberty interest exists in the maintenance of the family, this interest

must be weighed against the interests of the child). The state itself has a compelling interest in the health, education, and welfare of its children. *See Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982) (state has *parens patriae* interest in the welfare of children). The Fourteenth Amendment right to familial integrity, therefore, "involve[s] a weighing of the parents' rights against the interests of the child and the state. Whether a plaintiff's constitutional rights are violated, then, 'would depend on a balancing of these two conflicting interests.'" *Franz v. Lytle*, 791 F.Supp. 827, 833 (D.Kan.1992) (quoting *Whitcomb v. Jefferson County Dep't of Social Servs.*, 685 F.Supp. 745, 747 (D.Colo.1987)). Because the liberty interest in familial relationships must "always be balanced against the governmental interest involved, it is difficult, if not impossible, for officials to know when they have violated 'clearly established' law." *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir.1992); *see also Franz*, 791 F.Supp. at 833 (holding that "[a] reasonable official, 'knowing only that [he] must not infringe on family integrity, would not necessarily know what conduct was prohibited.'" (quoting *Frazier*, 957 F.2d at 931)).

▮ The government has a compelling interest in the welfare of children, and the relationship between parents and their children may be investigated and terminated by the state, provided constitutionally adequate procedures are followed. *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982). The state has a "right—indeed, duty—to protect minor children through a judicial determination of their interests in a neglect proceeding." *Stanley*, 405 U.S. at 649, 92 S.Ct. at 1212. In fact, it is "well established that officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a *prior* court order.'" *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 826 (2d Cir.1977)); *see also Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir.) (stating that constitutionally protected interest in family relations is limited by compelling government interest in protection of minor children, particularly in circumstances where protection

may be necessary as against the parents themselves), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

▮ In this case, whether Defendants are entitled to qualified immunity turns on the reasonableness of their belief that a sufficient emergency existed to warrant taking Jessica and Shamra into temporary custody. This analysis is not one of hindsight, but rather is determined by Defendants' action "in the context of circumstances with which [Defendants were] confronted." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038.

▮ We find that the Oldfields have failed to establish that the removal of their children was an act of conspiracy by Defendants in retaliation for the Oldfields' complaint regarding Benavidez. We also find that the Oldfields have failed to show that the procedures used by HSD in responding to Jessica's allegations of child abuse "violated the nebulous right of familial integrity." *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir.1988).

We begin our factual analysis by addressing Plaintiffs' contentions that the removal of the children was purely an act of conspiracy between Defendants in retaliation for reporting Benavidez's inappropriate conduct toward Jacque Oldfield. The Oldfields allege that their right to familial integrity was violated because Benavidez initiated temporary custody proceeding against them as a method of retaliation for their complaints. The Oldfields, however, fail to allege in their complaint any specific facts to prove that Benavidez was involved in the initiation of proceedings by HSD officials to obtain temporary custody of the Oldfield children. HSD requested the ex parte custody order in response to Jessica's note to her teacher and her subsequent conversations with her teacher and other HSD officials. The ex parte custody order was ordered by a neutral judge. The only evidence before the judge was an affidavit for ex parte custody order and a neglect and abuse petition. The affidavit included: (1) the exact wording of Jessica's note to her teacher reporting abuse; (2) information on Jessica's conversation with her teacher and with the psychologist who

examined her; and (3) information regarding a previous abuse and neglect investigation conducted on the Oldfields. The neglect and abuse petition was simply a standard form with names and addresses filled in. It contained no substantive information.

The decision to seek the ex parte custody order was made without any information from Benavidez. The only involvement by the Sheriffs Department was the presence of Deputy Sheriff Gene Johnson at the meeting in which Fuldauer, another HSD official, and Johnson determined what course of action would be best for Jessica and Shamra's well-being. The record fails to disclose any facts that suggest improper communications between Benavidez and Johnson, nor are there any facts that implicate Johnson in the alleged conspiracy. Indeed, Johnson is not a named defendant. Finally, no information other than that found in the affidavit and in the neglect and abuse petition was presented to the judge from any of the Defendants. There is no evidence in the record to suggest that Benavidez prompted Jessica to report her parents or write the note. Moreover, Benavidez provided no information to the judge who issued the ex parte order. In fact, Benavidez became involved in the Oldfield case *after* the ex parte custody order was issued and, then, only because the school requested that the order be issued by the sheriff's department and not on school premises. Even if Benavidez had every intention to retaliate against the Oldfields, there is no evidence that he did so by initiating proceedings to take custody of the Oldfields' children.

We next address the Oldfields' argument that HSD should have conducted further investigation before applying for an ex parte order and that the ex parte order was obtained by using false information from Benavidez and Fuldauer. The removal of Jessica and Shamra via an ex parte order was due to Defendants having probable cause to believe that the Oldfield children were being abused or neglected by one or both of their parents and that removal was necessary to insure

their safety. *See* NMSA 1978, §§ 32-1-1 to -53 (Repl.Pamp.1989) (repealed 1993); Child Protective Services—Procedures, Ten Day Ex Parte Custody Hearing, N.M. Human Serv. Dep't Reg. PR 4.4.2 (Dec. 11, 1989); NMSA 1978, § 32A-4-16 (Repl.Pamp. 1993). Jessica and Shamra were removed from their home temporarily because Jessica reported physical and emotional abuse to her teacher. Jessica's teacher and principal contacted HSD as required by law. HSD investigated by interviewing Jessica several times and determined that Jessica and Shamra were in possible danger if they remained in the home at that time. They had probable cause to believe Jessica and Shamra were in danger of further abuse because of Jessica's fear of retaliation by her step-father, a prior report by Jessica's school that Gilbert Oldfield had been verbally and physically threatening to school officials,[1] and a criminal conviction for previous drug involvement that corroborated Jessica's story. Defendants believed that the Oldfield children were being abused and that Gilbert Oldfield might retaliate against Jessica for reporting the abuse. In these circumstances, we think Defendants' actions in temporarily removing the Oldfield children from the home were objectively reasonable, and as a matter of law violated no particular right to familial integrity. Defendants' motion for summary judgment based on qualified immunity should have been granted.

### III

We next address Defendants' argument during oral arguments that the Oldfields' First Amendment claim lacks merit and is irrelevant to the facts in this case. In their complaint, the Oldfields alleged that Defendants' conduct in requesting temporary custody of Jessica and Shamra via an ex parte order violated their First Amendment rights. The Oldfields argued that Defendants conspired to temporarily remove their children from the home as retaliation for complaining about Sheriff Benavidez's

---

1. The Oldfields contend that Gilbert Oldfield was not threatening to school officials in any way during the prior incident. HSD would have no reason to disbelieve a report by school officials that Gilbert Oldfield had been verbally and physically threatening. HSD properly considered this information in its investigation.

harassment of Jacque Oldfield. The Old-
fields contended that their First Amendment
right to complain and criticize public officials
without retaliation was violated. We dis-
agree.

The Oldfields were not restrained from
exercising their right to complain about
Sheriff Benavidez's harassment of Jacque
Oldfield, and, in fact, Sheriff Benavidez was
reprimanded for his inappropriate conduct
towards Jacque Oldfield. The heart of the
Oldfields' claim is that their First Amend-
ment rights were violated because Benavidez
initiated temporary custody proceedings
against them. As discussed above, the Old-
fields failed to provide any specific facts to
prove that Benavidez or any of the other
defendants were involved in the initiation of
custody proceedings as a form of retaliation.
Consequently the Oldfields' First Amend-
ment claim must fail. We remand this case
to the district court for proceedings consis-
tent with this opinion. The decision of the
district court is REVERSED.

IT IS SO ORDERED.

RANSOM, C.J., and MONTGOMERY, J.,
concur.