2001-NMCA-065

31 P.3d 1027

**Ruby CHAVEZ, Plaintiff,**

v.

**BOARD OF COUNTY COMMISSIONERS OF CURRY COUNTY, New Mexico, Defendant.**

**Consolidated with Ruby CHAVEZ, Plaintiff–Appellee,**

v.

**Waldo CASAREZ and Charlie Aguirre, Defendants–Appellants.**

**Nos. 21,066, 21,277.**

Court of Appeals of New Mexico.

July 23, 2001.

Michael T. Garrett, Garrett Law Firm, P.A., Clovis, NM, for Appellee.

Thomas L. Murphy, Beall & Biehler, P.A., Albuquerque, NM, for Appellants.

## OPINION

FRY, Judge.

{1} Defendants Waldo Casarez and Charlie Aguirre appeal a judgment after a jury verdict in favor of Plaintiff Ruby Chavez in this civil rights action pursuant to 42 U.S.C. § 1983 (1994). Defendants assert that the trial court erred in (1) denying their claim of qualified immunity; (2) instructing the jury on Plaintiff's Fourth Amendment claim; (3) refusing to exclude Plaintiff's expert witness for late disclosure; (4) admitting evidence of events that occurred after Defendants' warrantless entry into Plaintiff's home; and (5) if the judgment is reversed, awarding attorney's fees and costs to Plaintiff. We affirm on all issues.

## BACKGROUND

{2} Defendants are deputy sheriffs with the Curry County Sheriff's Department. On October 23, 1995, they were called to assist two social workers from the Children, Youth & Families Department (CYFD) on a "child welfare check" at Plaintiff's home. Plaintiff's son, Moses, had not been attending elementary school. Plaintiff had attempted to transfer the child to another school but did not complete the paperwork for the transfer. Thus, one reason for the visit to Plaintiff's home was to investigate suspected truancy or educational neglect.

{3} The social workers, however, also had other concerns about Moses' welfare. They thought that he was possibly neglected based on what appeared to be poor nutrition. Aside from suspected malnutrition, however, it does not appear that the social workers had any other reason to believe that Moses was neglected or abused. For example, there is no evidence in the record that CYFD

had received any reports of physical abuse or mistreatment of the child.

{4} Defendants were asked to serve as "back-up" on the welfare check. One of the social workers, Sandi Hickey, testified that law enforcement officers were often called as "back-up" on welfare checks to assist social workers in finding a home, gaining access to a child, minimizing the risks and dangers associated with going to a residence, and working with families. Ms. Hickey also explained that, according to CYFD's internal policies and procedures, if entry to a home or access to a child is denied, CYFD may, through its legal department, seek a court order to gain entry to a home or access to a child. While a court order is being secured, law enforcement officers may be asked to remain at a residence to prevent a caretaker from leaving with the child.

{5} Prior to the welfare check, Deputy Casarez spoke with Jon Pennington, an inexperienced social worker who had been assigned to Moses' case. Pennington explained to Deputy Casarez that Moses had been improperly withdrawn from school and was "possibly neglected and abused." He also advised that he had visited Plaintiff's home several days earlier to check on Moses' welfare, but was unable to make contact with the child. At trial, Plaintiff testified that she had told Pennington that Moses was not at home because she had sent him to Colorado to be home-schooled. Pennington also informed Deputy Casarez that he suspected Plaintiff and her fiancé had been smoking marijuana because their eyes were red. Because of the suspected drug activity, Pennington assessed Plaintiff's home as being potentially violent.

{6} When Defendants and the social workers arrived at Plaintiff's home, they knocked on the front door. Plaintiff answered. Ms. Hickey announced that they were there to check on Moses' welfare. Plaintiff stated that Moses was not home. Ms. Hickey asked if they could come inside the home. Initially, Plaintiff did not have a problem with Ms. Hickey, or even Deputy Casarez, coming inside. However, when Pennington also insisted on entering, Plaintiff became angry and upset and changed her mind. She refused to let anyone in and began to shut the door,

stating that they needed a search warrant. Replying that he did not need a warrant, Deputy Casarez pushed the door open and forced his way into the house. Deputy Aguirre followed. After a struggle, Defendants arrested Plaintiff. Defendants then took Plaintiff outside to the police car in handcuffs as neighbors looked on. Her clothing was torn, her bra was showing, and her breast was exposed. Her arms were bruised as a result of the struggle.

{7} Upon Plaintiff's arrest, the social workers searched her home; it was clean and in order, and there was no evidence of any criminal activity. Plaintiff's three-year-old daughter was also in the house, but was not in any danger. Moses was not at home, and it was later verified that he was living with a relative in Colorado.

{8} Plaintiff filed this civil rights action against Defendants claiming that they violated her Fourth Amendment right to be free from unreasonable searches and seizures. Following a trial, the jury returned verdicts in favor of Plaintiff and against Deputy Casarez in the amount of $5,000, and against Deputy Aguirre in the amount of $2,500. Defendants appeal from the final judgment.

## DISCUSSION

### I.  Qualified Immunity

#### A.  Review of Qualified Immunity Following Trial and Final Judgment

{9} The question of qualified immunity comes to us for review following a full trial on the merits and final judgment. Although a defendant may immediately appeal the denial of summary judgment on qualified immunity grounds, Defendants here did not appeal the trial court's denial of their motion for summary judgment on the issue. On appeal, Plaintiff does not assert that Defendants waived qualified immunity by failing to appeal the trial court's denial of summary judgment; however, we address the issue of waiver as a preliminary matter to clarify the law regarding when the defense of qualified immunity may be asserted below and raised on appeal by defendants.

{10} Qualified immunity is not only a defense to liability but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S.

511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, a pretrial order denying qualified immunity on purely legal grounds is immediately reviewable under the collateral order doctrine because it "implicates rights that will be irretrievably lost, absent immediate review and regardless of the outcome of an appeal from the final judgment." *Carrillo v. Rostro,* 114 N.M. 607, 614, 845 P.2d 130, 137 (1992); *Mitchell,* 472 U.S. at 526–30, 105 S.Ct. 2806; *cf. Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (holding that denial of summary judgment based solely on existence of genuine issues of material fact is not subject to collateral review).

{11} Typically in New Mexico, government officials present the issue of qualified immunity to the appellate court by means of a petition for writ of error seeking immediate review of the trial court's denial of a motion for summary judgment or motion to dismiss based on qualified immunity. *See, e.g., Cockrell v. Bd. of Regents of N.M. State Univ.,* 1999–NMCA–073, ¶ 2, 127 N.M. 478, 983 P.2d 427; *see also Carrillo,* 114 N.M. at 614, 845 P.2d at 137 (explaining that petition for writ of error is proper procedure for reviewing collateral orders such as orders denying qualified immunity); *cf. Doe v. Leach,* 1999 NMCA 117, ¶ 17, 128 N.M. 28, 988 P.2d 1252 (granting writ of error to review claim of qualified immunity where trial court deferred ruling on motion for summary judgment and ordered parties to submit to discovery). In this case, however, Defendants elected not to appeal the trial court's denial of summary judgment on qualified immunity grounds, even to the extent it turned on the pure legal issue of whether Plaintiff's constitutional rights were clearly established. Instead, they raise the issue on direct appeal following a final judgment on the merits.

{12} Ordinarily, "a denial of a motion for summary judgment is not reviewable after final judgment on the merits." *Green v. Gen. Accident Ins. Co. of Am.,* 106 N.M. 523, 527, 746 P.2d 152, 156 (1987). However, because qualified immunity also serves to protect public officials from liability for damages, *see Mitchell,* 472 U.S. at 525–27, 105 S.Ct. 2806, and may be reasserted at other

stages in the litigation, including at trial, we determine that the failure to immediately appeal the denial of summary judgment on qualified immunity grounds did not bar Defendants from raising the issue on appeal after a trial on the merits. *See Matherne v. Wilson*, 851 F.2d 752, 756 (5th Cir.1988) ("There may be good reasons why a defendant may elect to not appeal before trial, and we see little value in a rule of waiver that would force unwanted appeals, many of which undoubtedly never would have been necessary."); *accord Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir.1999); *Hamm v. Powell*, 874 F.2d 766, 770 (11th Cir.1989). Thus, by not appealing the denial of summary judgment and standing trial, Defendants clearly waived immunity from suit, but they did not waive the right not to be held liable for conduct that did not violate clearly established law. This is particularly true because they renewed their qualified immunity argument throughout the trial proceedings, including in their motion for directed verdict, objection to jury instructions, and motion for judgment notwithstanding the verdict. *See Rakovich v. Wade*, 850 F.2d 1180, 1205–06 (7th Cir.1988) (observing that qualified immunity is not limited to summary judgment context, although benefits of immunity lessen as suit progresses to trial, and may be considered at directed verdict or judgment notwithstanding verdict stage). Therefore, the issue of qualified immunity is properly before us.

### B. Standard of Review

{13} The denial of qualified immunity raises questions of law entitled to de novo review. *See Campos de Suenos, Ltd. v. County of Bernalillo*, 2001–NMCA–043, ¶ 10, 130 N.M. 563, 28 P.3d 1104 (2001). Because Defendants appeal from a final judgment following a trial on the merits, however, we review the qualified immunity question based on the complete record, including the evidence presented at trial, and not on the summary judgment record. *See* 15A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3911 n. 80 at 362 (1992) (stating that because denial of summary judgment based on defense of official immunity may be followed by a trial that produces information different from that made available on the summary judgment motion, appellate review after trial should be based on the sufficiency of evidence at trial, not the sufficiency of evidence on the summary judgment motion). As we are reviewing the sufficiency of the evidence to support the trial court's decision to allow the jury to determine that Defendants did not enjoy qualified immunity, we review the evidence in the light most favorable to that decision, including drawing all inferences and resolving all credibility determinations in favor of that decision. *See Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (stating the usual substantial evidence standard of review).

### C. Merits of Qualified Immunity Issue

{14} Government officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Kennedy v. Dexter Consol. Schs.*, 2000–NMSC–025, ¶ 10, 129 N.M. 436, 10 P.3d 115. "This immunity extends to law enforcement officers." *Williams v. Bd. of County Commr's of San Juan County*, 1998–NMCA–090, ¶ 22, 125 N.M. 445, 963 P.2d 522.

{15} In evaluating a claim of qualified immunity, we perform a two-step inquiry. First, we ask whether the relevant law was clearly established at the time of the alleged violation of the constitutional right. *Herring v. Keenan*, 218 F.3d 1171, 1181 (10th Cir.2000) (Seymour, C. J., dissenting). Second, if the law was clearly established, we proceed to ask whether the official's conduct was objectively reasonable in light of the law at the time of the challenged conduct. *Id.; see generally Anderson v. Creighton*, 483 U.S. 635, 640–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We affirm under both parts of the analysis.

#### 1. Clearly Established Law

{16} Defendants argue that they are entitled to qualified immunity because Plain-

tiff failed to meet her burden of showing that in October 1995 it was clearly established that law enforcement officers assisting social workers in a child welfare check could not enter a home without a search warrant where they honestly but mistakenly believed that a child was inside and in danger. For an asserted right to be "clearly established," its "contours ... must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.; accord Kennedy*, 2000–NMSC–025, ¶ 13, 129 N.M. 436, 10 P.3d 115. We conclude that Plaintiff met her burden of showing that she had a clearly established right which Defendants violated. *See Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir.1996) (discussing plaintiff's burden of proof in overcoming qualified immunity defense).

■ {17} Plaintiff argued, and the trial court agreed, that she had a clearly established right pursuant to the Fourth Amendment to be free from a warrantless entry and search of her home by law enforcement officers, absent exigent circumstances. Plaintiff relied primarily on three cases for this proposition: *State v. Copeland*, 105 N.M. 27, 727 P.2d 1342 (Ct.App.1986); *State v. Aragon*, 1997–NMCA–087, 123 N.M. 803, 945 P.2d 1021; and *State v. Corneau*, 109 N.M. 81, 781 P.2d 1159 (Ct.App.1989). These cases support the general, well-settled proposition that law enforcement officers may not make a warrantless entry into a residence unless,

under the facts known or reasonably believed by a prudent and trained police officer, exigent circumstances have been shown indicating that immediate action is necessary to prevent imminent danger to life or serious damage to property, to forestall the imminent escape of a suspect, or to prevent the destruction of evidence.

*Aragon*, 1997 NMCA 087, ¶ 17, 123 N.M. 803, 945 P.2d 1021; *see also Copeland*, 105 N.M. at 31–32, 727 P.2d at 1346–47; *Corneau*, 109 N.M. at 89, 781 P.2d at 1167. Plaintiff argued that Defendants forcibly entered her

home in the absence of exigent circumstances.

{18} Defendants do not deny that in October 1995 "exigent circumstances" was a firmly established exception to the warrant requirement. Rather, they argue only that the trial court improperly relied on the exigent circumstances standard in denying qualified immunity because it applies only in the context of criminal investigations or arrests, and here, Defendants were solely assisting CYFD social workers in the welfare check of a child who was not attending school and was possibly abused or neglected. Defendants contend that in October 1995 there was no clearly applicable Fourth Amendment standard in New Mexico for law enforcement officers engaged in a community caretaking function in the context of a child abuse and neglect investigation. We disagree.

■ {19} First, we are not convinced that Defendants had no criminal investigative purpose in going to Plaintiff's home. According to both Defendants' motion for summary judgment and the undisputed trial testimony, one of the reasons the social workers and Defendants went to Plaintiff's home was to investigate Moses' suspected truancy and parental educational neglect. *See* NMSA 1978, § 22–12–7(D) & (E) (1987) (providing that nonattendance of public school may be basis for investigating and filing criminal charges against responsible parties under the New Mexico Compulsory Attendance Law). Because Defendants were concerned about not only possible child abuse or neglect but also the violation of mandatory school attendance laws, their conduct still had a criminal investigative aspect. *See State v. Nemeth*, 2001–NMCA–029, ¶ 36, 130 N.M. 261, 23 P.3d 936 (noting that criminal investigative or enforcement activity is motivated primarily by a "concern about violations of law on the part of the law enforcement officer"). Thus, we believe that Defendants' actions remained subject to the traditional exigent circumstances requirement discussed in *Aragon*, *Copeland*, and *Corneau*.

■ {20} Second, even assuming that Defendants accompanied the social workers to Plaintiff's home to investigate possible child abuse or neglect and entered the home

to protect a child, not to investigate a crime, they were still required to comply with the Fourth Amendment. Although Defendants are correct that there are no pre 1995 New Mexico appellate cases specifically addressing the scope of the Fourth Amendment in the context of a child abuse and neglect investigation, the absence of a case directly on point does not mean that a public official is automatically entitled to qualified immunity. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *Kennedy,* 2000–NMSC–025, ¶ 13, 129 N.M. 436, 10 P.3d 115 (noting that *Anderson* cautions against requiring too specific a correlation between the misconduct and the established law). In evaluating whether the law was clearly established, we ordinarily look to decisions of the United States Supreme Court, the federal courts of appeal, and the highest state court where the cause of action arose. *Yount v. Millington,* 117 N.M. 95, 101, 869 P.2d 283, 289 (Ct.App. 1993). We also consider whether "the clearly established weight of authority from other courts" supports the law as the plaintiff maintains. *Medina v. City & County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992). We conclude that in light of the pre-existing law, it was clearly established in October 1995 that, in cases of suspected child abuse or neglect, a law enforcement officer could not enter a home without a warrant unless the officer had reasonable grounds to believe that a child within was in immediate need of aid or assistance and that immediate entry was required to render that aid.

{21} At the time of entry into Plaintiff's home, it was well-settled that the Fourth Amendment to the United States Constitution prohibited unreasonable searches and seizures and was intended to protect the sanctity of an individual's home and privacy. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *see also United States v. United States Dist. Ct.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (declaring that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). It was also well-established that a warrantless entry into a home was per se unreasonable, except in a few carefully limited exceptions to the warrant requirement. *See Cady v. Dombrowski,* 413 U.S. 433, 439,

93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), emergency intrusions, undertaken to protect life or to avoid serious bodily injury, were recognized as one such exception:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.

*Id.* (footnotes omitted). Moreover, the United States Supreme Court has determined that Fourth Amendment guarantees extend beyond criminal investigations to the civil context. *See Soldal v. Cook County, Ill.,* 506 U.S. 56, 67 n. 11, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Camara v. Mun. Ct.,* 387 U.S. 523, 530, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ("It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.").

{22} By October 1995, at least two federal circuit courts had specifically addressed the issue of whether the Fourth Amendment and its requirements apply to child abuse cases: *Good v. Dauphin County Soc. Servs. for Children & Youth,* 891 F.2d 1087 (3d Cir. 1989); *White v. Pierce County,* 797 F.2d 812 (9th Cir.1986). In *Good,* the Third Circuit held it was clearly established, for qualified immunity purposes, that law enforcement officers investigating suspected child abuse could not enter or search a home without a warrant except in "exigent circumstances." *See Good,* 891 F.2d at 1093 (stating that " '[e]xigent circumstances,' " in case of suspected child abuse, "is a shorthand for a number of related exceptions to the normal requirement of a search warrant"); *cf. Nemeth,* 130 N.M. 261, 23 P.3d 936, 2001–NMCA–029, ¶¶ 32–35 (noting that terms "community caretaker," "emergency aid or assistance," and "exigent circumstances" have been used by different courts to denote the same activity). Under "this very limited exception, the state actors making the search

must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Good,* 891 F.2d at 1094. In *White,* the Ninth Circuit similarly determined that exigent circumstances applied to searches by law enforcement officers in child abuse cases. *White,* 797 F.2d at 815–16; *see also Calabretta v. Floyd,* 189 F.3d 808, 814 (9th Cir.1999) (discussing *White* ).

{23} Defendants correctly point out that by October 1995 the Tenth Circuit had not yet specifically addressed "the difficult issue of the scope of the fourth amendment protection in the context of a child abuse investigation." *Snell v. Tunnell,* 920 F.2d 673, 697 (10th Cir.1990). However, the Tenth Circuit acknowledged in *Snell* that courts in other cases "have granted qualified immunity to those investigating claims of child abuse or neglect when there were circumstances which made it appear that the children were in danger and there was evidentiary support for such an assessment." *Id.* Therefore, by October 1995 it was apparent from the "clearly established weight of authority from other courts," *Medina,* 960 F.2d at 1498, that a law enforcement officer in a child abuse or neglect investigation could not enter a home without a warrant in the absence of an emergency situation. *See also Wooten v. State,* 398 So.2d 963, 966 (Fla.Dist.Ct.App.1981); *State v. Jones,* 45 Or.App. 617, 608 P.2d 1220, 1222 (1980); *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516, 522 (1983).

{24} Moreover, in *Oldfield v. Benavidez,* 116 N.M. 785, 791, 867 P.2d 1167, 1173 (1994), a civil rights case, our Supreme Court held that social workers and a sheriff who took temporary custody of children without parental consent or a court order were entitled to qualified immunity where they had a reasonable belief that a "sufficient emergency existed" to warrant taking the children into temporary custody. *See also* NMSA 1978, § 32A–4–6(A)(1) (1993) (providing that a child may be held or taken into custody "by a law enforcement officer when the officer has reasonable grounds to believe that the child is suffering from illness or injury as a result of alleged abuse or neglect or has been abandoned or is in danger from the child's surroundings and removal from those surroundings is necessary"). Although Defen-

dants are correct that neither *Oldfield* nor Section 32A–4–6(A)(1) expressly addresses the warrant requirement in the context of a child abuse and neglect investigation, we determine that implicit in these New Mexico authorities is the recognition that a law enforcement officer may not intrude on a person's reasonable expectation of privacy unless the officer has reasonable grounds to believe that immediate action is necessary to safeguard a child from imminent harm or injury. *See Yvonne L. v. N.M. Dep't of Human Servs.,* 959 F.2d 883, 891 (10th Cir. 1992) (noting that plaintiff's right may be " 'expressly established by, or clearly implicit in, existing case law' " (citation omitted)). Therefore, based on the pre-existing law discussed above, we conclude that in October 1995, Defendants should have known that they could not enter Plaintiff's home without a warrant unless they had not only a good faith, but also a reasonable belief that a child inside was in imminent danger of serious bodily harm and that immediate action was necessary to avert the danger.

{25} We note that in *Nemeth,* we recently adopted and applied a community caretaking exception to police-citizen encounters in the home. There, police officers were responding to a 911 call regarding a possible suicide threat and entered the person's home to render emergency aid. Although we indicated in *Nemeth* that the issue of community caretaking in the home was one of first impression, *Nemeth,* 2001–NMCA–029, ¶ 28, 130 N.M. 261, 23 P.3d 936, the community caretaking test we adopted was founded on well-established Fourth Amendment principles and developed case law from other jurisdictions, consistent with the principles and authorities discussed in this opinion. *Id.* ¶¶ 31–35. Thus, we believe that *Nemeth* supports our determination that the law was clearly established, even before the case was decided, that an officer could not enter a home without a warrant absent a showing of exigent circumstances or an emergency situation.

## 2. Objective Reasonableness of Defendants' Conduct

{26} Having determined that the law was clearly established, we consider

whether Defendants' actions were objectively reasonable under the circumstances. The relevant question is whether a reasonable officer could have believed the warrantless entry and search to be lawful, in light of the clearly established law and the information possessed at the time. *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. Because the test is objective, the officer's subjective beliefs about the entry are irrelevant. *Id.*

{27} Although Deputy Casarez testified that he entered the home because he believed he was faced with an emergency situation, we conclude that a reasonable and prudent law enforcement officer in the same circumstances would not have believed there were children in the home who were in imminent danger of serious bodily harm and that immediate action was necessary to alleviate that danger. *See Good,* 891 F.2d at 1094. Based on the facts available at the time of entry, Deputy Casarez had no reason to believe that Moses was inside the home, let alone threatened with serious bodily harm. When Plaintiff answered the door, she informed Defendants and the social workers, as she had told Pennington several days earlier, that Moses was not there. Defendants did not observe anything to the contrary. They did not see or hear Moses or any other children on the premises who appeared to be in distress or in danger. *Cf. Wooten,* 398 So.2d at 965–67 (holding that entry was justified under emergency doctrine where officer received report of infant being shaken and struck and observed child's lifeless condition); *Jones,* 608 P.2d at 1222 (holding that exigent circumstances existed where, after receiving anonymous call that children had been left alone, police observed unattended children crying in dirty home). Although the social workers had a vague and general suspicion that Moses was neglected and malnourished, they did not inform Defendants of the basis for this belief, and Defendants had no independent information regarding any alleged abuse or neglect.

{28} Moreover, although Plaintiff got angry and upset during the encounter, it was only because Pennington, with whom Plaintiff had clashed several days earlier, insisted on coming inside. Plaintiff initially had no problem with Ms. Hickey, or even Deputy Casarez, entering her home. Thus, contrary to Defendants' assertion, Plaintiff's conduct did not give rise to a reasonable belief on the part of the deputies that Plaintiff was trying to hide evidence of abuse or neglect. *Cf. White,* 797 F.2d at 815 (determining that officer could reasonably conclude from father's attempt to stop son from showing his back to deputies that he was attempting to hide past abuse). Rather, Plaintiff's agitation was due to her conflict with Pennington who had accused her of drug use several days earlier.

{29} Finally, even Ms. Hickey testified that she was surprised by Defendants' coerced entry into the house under these circumstances. She testified that, under CYFD's internal guidelines, the next appropriate step would have been to attempt to obtain a court order to gain entry to the residence and to have the deputies stay at the house until the order was secured.

{30} Under these circumstances, we conclude that a reasonable law enforcement officer would not have believed that an emergency situation existed requiring immediate entry. *See People v. Smith,* 7 Cal.3d 282, 101 Cal.Rptr. 893, 496 P.2d 1261, 1263 (1972) (cautioning that the emergency exception "must not be permitted to swallow the rule: in the absence of a showing of true necessity-that is, an imminent and substantial threat to life, health, or property-the constitutionally guaranteed right to privacy must prevail"). In summary, because the relevant law was clearly established in October 1995, and because the Defendants' actions were objectively unreasonable, we conclude that Defendants are not entitled to qualified immunity.

## II. Jury Instruction

{31} Defendants make the related argument that, because this case did not involve a criminal investigation, the trial court improperly instructed the jury on the exigent circumstances standard with respect to Plaintiff's claim. Because we conclude, for the reasons discussed above, that the exigent circumstances requirement was applicable, we hold that the trial court properly instructed the jury on exigent circumstances.

{32} We note that the trial court also correctly instructed the jury on the emergency exception to the warrant requirement. The instruction states that one exception to the general warrant requirement is "an emergency situation." The instruction further explains that "[a] law enforcement officer who has a reasonable and good faith belief that there is a serious threat to his safety or the safety of someone else may enter and make a safety inspection of a dwelling for the purpose of insuring or protecting his well-being and the well-being of others." The instruction, as given by the trial court, fairly presents the issues and correctly states the law for the reasons discussed above.

{33} Defendants also argue that the instruction was not supported by the evidence. However, because Plaintiff presented evidence of the improper actions of both Defendants, we conclude that the instruction was also supported by the evidence. *See Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 727, 688 P.2d 333, 337 (Ct.App.1984) ("Instructions must correctly state the law and be based on the evidence."). Therefore, we affirm on this issue.

### III. Admission of Expert Witness Testimony

{34} Defendants argue that the trial court erred in refusing to exclude Plaintiff's expert witness, Chet Spear, for late disclosure in violation of the discovery rules. *See* Rule 1-026(E)(1) NMRA 2001. The expert witness was disclosed in supplemental discovery approximately one week before trial. Defendants filed a motion in limine to exclude the expert from testifying at trial.

{35} The admission of expert testimony is within the sound discretion of the court and will not be disturbed absent an abuse of discretion. *See Leithead v. City of Santa Fe*, 1997–NMCA–041, ¶ 27, 123 N.M. 353, 940 P.2d 459. Similarly, remedies for the violation of discovery rules or orders are discretionary with the trial court. *Shamalon Bird Farm, Ltd. v. United States Fid. & Guar. Co.*, 111 N.M. 713, 716, 809 P.2d 627, 630 (1991).

{36} Here, Plaintiff's untimely disclosure of the expert witness did not go unnoticed by the trial court. To remedy the discovery violation, the trial court prohibited Plaintiff from presenting Mr. Spear as a witness in her case-in-chief but permitted him to be called as a rebuttal witness. We conclude that the trial court did not abuse its discretion in limiting Mr. Spear's testimony to rebuttal evidence as a sanction.

{37} Moreover, Defendants have not shown any prejudice resulting from the untimely disclosure of the expert witness. *See State v. Deutsch*, 103 N.M. 752, 756, 713 P.2d 1008, 1012 (Ct.App.1985) (noting that a party is not entitled to relief for a discovery violation unless the party has been prejudiced by the violation). They do not explain how their cross-examination of the witness could have been improved without the late disclosure, especially where defense counsel was able to impeach his credibility during cross-examination by questioning him about his pending lawsuit against Curry County. Furthermore, the trial court offered the defense additional time to prepare for the cross-examination of the expert witness, but the defense declined the offer. A party "cannot complain about unfairness when it did not take all the measures reasonably available to protect itself as a litigant." *Leithead*, 1997–NMCA–041, ¶ 28, 123 N.M. 353, 940 P.2d 459. Therefore, we affirm the trial court's admission of the testimony.

### IV. Admission of Post–Entry Evidence

{38} Defendants argue that the trial court erred in admitting evidence of events that occurred after the warrantless entry because the trial court subsequently limited Plaintiff's claim to the warrantless entry and removed her claims of excessive force and false arrest from the jury. Defendants contend that the admission of the "post-entry" evidence, including the scuffle with Defendants, Plaintiff's injuries, her torn clothing, and her lost rental income and pre-existing back injury, was highly prejudicial and should not have been considered by the jury.

{39} Defendants concede that they did not object to the admission of the post-entry evidence, with the exception of the lost rent and the pre-existing back injury. As a result, they contend that admission of the post-

entry evidence constituted "fundamental error." *See* Rule 12–216(A) NMRA 2001 (providing that preservation rule does not preclude review of jurisdictional question or questions involving general public interest or fundamental error). We disagree.

■ {40} The fundamental error doctrine generally does not apply in civil cases. *Diversey Corp. v. Chem–Source Corp.*, 1998–NMCA–112, ¶ 40, 125 N.M. 748, 965 P.2d 332. It applies only in exceptional circumstances, such as when

> substantial justice was not done, the court was deprived of jurisdiction to hear the case, the issue was one of general public interest that would impact a large number of litigants, or, there was a "total absence of anything in the record of the case showing a right to relief[.]"

*Id.* (quoting *Gracia v. Bittner*, 120 N.M. 191, 197, 900 P.2d 351, 357 (Ct.App.1995)). We find none of these circumstances in this case and note that the evidence at trial showed a right to relief by Plaintiff on her warrantless entry claim.

■ {41} Although the trial court should have instructed the jury to disregard the testimony concerning Plaintiff's lost rents and prior back injury upon Defendants' request for a cautionary instruction, the failure to do so was not prejudicial because Plaintiff made it clear in her testimony that she was not claiming damages with respect to those items. *See In re Estate of Heeter*, 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App.1992) ("On appeal, error will not be corrected if it will not change the result.").

{42} Moreover, Defendant's reliance on *Lewis v. Samson*, 1999–NMCA–145, 128 N.M. 269, 992 P.2d 282, *cert. granted*, No. 25,990, 128 N.M. 150, 990 P.2d 824 (1999), is misplaced because preservation was not a problem in that case. In that wrongful death case, the issue raised on appeal-whether defendants were successive or concurrent tortfeasors-was actually preserved by the plaintiff's pre-trial motion to exclude the decedent's assailant from being considered a concurrent tortfeasor. *Id.* ¶ 35. By contrast, in this case, Plaintiff made no objection to alert the trial court's attention to the issue of whether the post-entry evidence should be excluded given the court's subsequent limitation of Plaintiff's claims. *See* Rule 12 216(A). Although Defendants filed a pre-trial motion alleging discovery violations by Plaintiff, those issues-late disclosure of witnesses and late disclosure of legal theories or recovery-were entirely distinct from the evidentiary issue now being raised on appeal.

{43} If Defendants believed that evidence of the post-entry events had become irrelevant or prejudicial, they should have requested a limiting instruction from the trial court when the instructions were being settled. By not doing so, they waived error. *See State v. Martinez*, 102 N.M. 94, 100, 691 P.2d 887, 893 (Ct.App.1984) (noting that, where an improper admission of evidence can be cured by a limiting instruction, the proper remedy is to request such an instruction, and failure to do so constitutes waiver of error); *accord DeMatteo v. Simon*, 112 N.M. 112, 114, 812 P.2d 361, 363 (Ct.App.1991).

■ {44} Insofar as Defendants argue that the trial court should have dismissed the complaint for failure to disclose Plaintiff's theories of liability prior to trial, we conclude that there was no abuse of discretion in denying the requested relief. *See Smith v. FDC Corp.*, 109 N.M. 514, 523, 787 P.2d 433, 442 (1990). Dismissal is a severe sanction and is justified only when a party shows flagrant bad faith and callous disregard for one's discovery duties. *Reed v. Furr's Supermarkets, Inc.*, 2000–NMCA–091, ¶ 10, 129 N.M. 639, 11 P.3d 603.

{45} During discovery in this case, Defendants propounded an interrogatory to Plaintiff asking her to specify all her claims of liability. Plaintiff initially objected to the interrogatory "on the grounds that [d]iscovery ha[d] just commenced and Plaintiff's counsel w[ould] provide liability arguments at a later date." Although Defendants contend that Plaintiff never supplemented her answer to this interrogatory prior to trial, our review of the record reflects that, approximately one week before trial, Plaintiff furnished Defendants with a discovery response providing the requested information. Plaintiff indicated that her proposed expert witness intended to testify concerning such matters as unreasonable search of the home, wrongful arrest, excessive force, failure to supervise and train, and violation of Plaintiff's constitutional

rights. These claims should not have come as any surprise to Defendants given that the factual bases of the claims were adequately covered in the complaint and in the parties' summary judgment briefs. Thus, because we find no evidence that Plaintiff acted willfully or in bad faith, we determine that the trial court was within its discretion in refusing to grant dismissal as a sanction.

## V. Award of Attorney's Fees and Costs

{46} Finally, Defendants argue that if this Court reverses the trial court's final judgment, it should vacate the award of attorney's fees and costs for Plaintiff as the prevailing party. Because we affirm the judgment, however, we also affirm the award of attorney's fees and costs. Plaintiff has requested her attorney's fees and costs on appeal pursuant to Rule 12–403 NMRA 2001. This rule allows an appellate court to award attorney's fees where permitted by law and such other costs as the court deems proper. Ordinarily, a prevailing party in a civil rights action is entitled to reasonable attorney's fees unless special circumstances would render such an award unjust. 42 U.S.C. § 1988(b) (1994); *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Under § 1988, a prevailing party may recover reasonable attorney's fees not only for obtaining a favorable judgment following trial, but for successfully defending that judgment on appeal. *See, e.g., Weyant v. Okst,* 198 F.3d 311, 316 (2d Cir.1999); *Iqbal v. Golf Course Superintendents Ass'n of Am.,* 900 F.2d 227, 229–30 (10th Cir.1990); *Ustrak v. Fairman,* 851 F.2d 983, 990 (7th Cir.1988).

{47} Therefore, on remand, the trial court shall determine an appropriate award to Plaintiff of attorney's fees incurred in this appeal.

## CONCLUSION

{48} For the reasons set forth above, we affirm the judgment of the trial court.

{49} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD, Judge, CELIA FOY CASTILLO, Judge.